**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| ALLIANT TAX CREDIT FUND 31-A, LTD., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:11-CV-00832-RWS |
| | : | |
| M. VINCENT MURPHY, III, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

## ORDER

This case comes before the Court on Motions to Dismiss Complaint from Defendants Community Management Services, Inc. [3], Marilyn Murphy [10], M. Vincent Murphy, III [12], Gazebo Park Apartments of Acworth, LLC [17], Multifamily Housing Developers, LLC [23], Affordable Realty Management Inc. [25], and Patrick Carroll [26]; Motions for More Definite Statement from Defendant Community Management Services, Inc. [4] and M. Vincent Murphy, III [13]; and, Plaintiffs' Motions to Strike Defendants Patrick Carroll [35] and Affordable Realty Management Inc.'s [36] Reply Briefs. After considering the record, the Court enters the following Order.

## Background

Several entities under the umbrella name Alliant Tax Credit Fund ("Alliant" or "Plaintiffs") conduct business in Florida. (Dkt. No. [1] at ¶¶ 6–11). From 2003 through 2005, Alliant entered into six partnership agreements ("Partnerships") with, *inter alios*, Defendant M. Vincent Murphy, III ("Mr. Murphy" or "Judgment Debtor") to "acquire, develop, construct, own, and operate apartments as tax credit qualifying low income housing" for senior citizens in Kentucky. (Id. at ¶¶ 1, 22–24). As a condition for its entry into the Partnerships and to secure its investment, Alliant required Mr. Murphy to enter into personal guaranty agreements on each of the Partnerships. (Id. at ¶ 25). From 2004 through 2006, Mr. Murphy provided Alliant certified financial information that showed his net worth to be in excess of $25 million, and Alliant relied on this information to make decisions regarding its investment. (Id. at ¶¶ 35–38).

Five projects were completed in September 2005 and subsequently managed by Defendant Community Management Services, Inc. ("CMS"), a Georgia corporation wholly-owned by Mr. Murphy. (Id. at ¶¶ 15, 26–27). One project, however, remained uncompleted after Mr. Murphy sought and was denied loan modifications. (Id. at ¶¶ 26, 28). Beginning in 2007, Judgment

2

Debtor refused to pay interest and other expenses on all Partnership loans, and he advised his lender that he would not honor his personal guarantees and that he no longer possessed the previously disclosed guarantee assets. (Id. at ¶¶ 29, 31). Because the loans were in default, Alliant then sued Mr. Murphy, *inter alios*, on November 20, 2007, in the United States Eastern District Court of Kentucky, where he was found jointly and severally liable for $8,946,643 ("Judgment") on March 22, 2010. (Id. at ¶¶ 19, 34). The Judgment was registered in the Northern District of Georgia on November 12, 2010. (Id. at ¶ 20).

By the time of the Judgment, however, Alliant says that "Judgment Debtor's claimed net worth decreased from over $27 million in assets to practically nothing, as a result of … fraudulent acts." (Id. at ¶ 39). Generally, Alliant alleges that "Judgment Debtor, with the assistance of [his family] and affiliates, liquidated and divested his assets in such a way so as to allow [Mr. Murphy] to maintain continued direct control … and enjoyment of the assets at his discretion, while permitting him to disclaim … ownership in the assets and avoid auditors." (Id. at ¶ 41). Plaintiffs go on to specifically allege several fraudulent acts.

3

First, Plaintiffs allege that Mr. Murphy transferred his interest in his marital residence at 410 Society Street, Alpharetta, Georgia to his then-wife Defendant Marilyn Murphy ("Ms. Murphy") on March 23, 2007, despite Ms. Murphy giving no consideration in return. (Id. at ¶¶ 42–44). Alliant claims, upon information and belief, that Mr. Murphy still lives at the marital residence although Mr. Murphy and Ms. Murphy divorced in late 2007. (Id. at ¶¶ 45–46).

Second, Plaintiffs allege that Mr. Murphy and Ms. Murphy's divorce "was a sham" because Defendants continue to jointly operate businesses, share property, and reside at the same residence. (Id. at ¶ 50). The Property Settlement Agreement executed in connection with the divorce transferred Mr. Murphy's interest in, *inter alia*, furniture, stock, and other real property. (Id. at ¶¶ 47–48). Alliant claims these ownership transfers were made without consideration. (Id. at ¶ 49).

Third, Plaintiffs state that Mr. Murphy tried to hide assets via a fraudulent transfer through CMS and CMS's subsidiary, Defendant Multifamily Housing Developers, LLC ("Multifamily Housing"). (Id. at ¶¶ 15–16, 58–59). In exchange for management services, CMS received a portion of the revenue from various apartment complexes owned, in whole or in part, by Mr. Murphy through his other corporate entities. (Id. at ¶¶ 63–64). In 2006, CMS had a

4

market value of $1,862,310, and Multifamily Housing had a market value of $24,460. (Id. at ¶¶ 60, 62). On August 30, 2007, Mr. Murphy incorporated Defendant Affordable Realty Management, Inc. ("ARM") "for the purpose of transferring CMS's assets out of his wholly-owned entity and into ARM, a shell entity also owned and controlled by" Mr. Murphy. (Id. at ¶¶ 17, 65). Judgment Debtor allegedly "effectuated a transfer of the CMS Assets to ARM, thereby removing himself as an owner of the CMS Assets," to "hinder, delay, and defraud his creditors, including Alliant." (Id. at ¶¶ 68–69).

Fourth, Plaintiffs allege that Mr. Murphy tried to hide assets via a fraudulent transfer through Park Bridge Acworth LLC ("Park Bridge"), which was 99.9% owned by Mr. Murphy and consisted of a large apartment complex ("Apartment Complex") worth an estimated $8,760,000. (Id. at ¶ 51). CMS served as Park Bridge's property manager. (Id. at ¶¶ 15, 51). After Mr. Murphy defaulted on his obligations to Alliant, he filed an application of incorporation for Defendant Gazebo Park Apartments of Acworth, LLC ("Gazebo Park"), which was formally incorporated on March 9, 2007. (Id. at ¶¶ 52–53). Ms. Murphy became Gazebo Park's managing member. (Id. at ¶ 53). On April 30, 2007, Mr. Murphy effectuated a transfer of the Apartment Complex from Park Bridge to Gazebo Park, which removed his ownership interest in the Apartment

Complex although he continued to act as the Apartment Complex's agent. (Id. at ¶¶ 15, 51, 55). In 2009 "the Judgment Debtor replaced himself and listed [ARM] as Gazebo Park's registered agent, which also shared the same address as CMS, Park Bridge, and Gazebo Park." (Id. at ¶ 56). Alliant claims Mr. Murphy "has continued to exercise an unbroken chain of control over" the Apartment Complex despite these transfers. (Id. at ¶ 57).

Finally, Plaintiffs allege that Mr. Murphy made a personal loan of $968,000 to Defendant Patrick Carroll ("Carroll")—ARM's CEO—in March 2010 through Multifamily Housing. (Id. at ¶¶ 14, 70). The promissory note requires Carroll to pay $24,071.14 to Multifamily Housing each month for 47 months. (Id. at ¶ 71). Because Judgment Debtor is the sole signatory of Multifamily Housing's bank account and has sole control over the entity, Alliant claims Carroll's payments are transferred to Mr. Murphy. (Id. at ¶¶ 72–73).

On March 17, 2011, Plaintiffs sued Defendants in federal court, alleging civil conspiracy and multiple violations of the Georgia Uniform Fraudulent Transfers Act ("UFTA"), O.C.G.A. § 18-2-70 *et seq.* (Id. at ¶¶ 74–168). Each Defendant filed a motion to dismiss. (Dkt. Nos. [3], [10], [12], [17], [23], [25], and [26]). Mr. Murphy and CMS each filed a motion for a more definite

statement pursuant to Federal Rule of Civil Procedure 12(e), (Dkt. Nos. [4, 13]), and Plaintiffs filed two motions to strike ARM and Carroll's replies in support of the Defendants' motions to dismiss. (Dkt. Nos. [35–36]).

**Discussion**

**I.      Motions to Strike**

Both Carroll [34] and ARM [33] filed reply briefs in support of their motions to dismiss. In these replies, they argue that Georgia law prohibits "outsider reverse veil-piercing," in which a creditor tries to make a company liable for the debts of a member; therefore, Defendants allege, Plaintiffs failed to state a claim against ARM and Carroll. (Dkt. No. [35-1] at 4–7; Dkt. No. [36-1] at 4–7). Plaintiffs have moved to strike the replies because they contain arguments not initially raised in Defendants' motions to dismiss. (Dkt. No. [35-1] at 3–4; Dkt. No. [36-1] at 3–4). In the alternative, Plaintiffs ask the Court to allow them the opportunity to file surreplies. (Dkt. No. [35-1] at 4–5; Dkt. No. [36-1] at 4–5).

Under the Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Also, it is common practice for the Court not to hear arguments raised for the first time in a reply brief. See <u>United States</u>

7

v. Oakley, 744 F.2d 1553, 1556 (11th Cir. 1984) ("Arguments raised for the

first time in a reply brief are not properly before the reviewing court."); United

States v. Ga. Dep't of Natural Res., 897 F. Supp. 1464, 1471 (N.D. Ga. 1995)

("This court will not consider arguments raised for the first time in a reply

brief."). Although Carroll and ARM say that the " 'new argument' raised by the

movant[s] in the[ir] reply brief[s] is merely an extension of the arguments

originally made," the Court finds this assertion without merit because the

"outsider reverse veil-piercing" argument is an affirmative defense that is

distinct from Defendants' original arguments. (Dkt. No. [37] at 3, 5; Dkt. No.

[38] at 3, 5). Therefore, the Court will not consider the argument at this time.

Plaintiffs' Motions to Strike Defendants Patrick Carroll [35] and ARM's [36]

Reply Briefs are **GRANTED**.

## II.      Motions for More Definite Statement

In their Motions for More Definite Statement, Defendants Mr. Murphy

and CMS argue that "Plaintiffs' claims of a 'fraudulent transfer' are so vague or

ambiguous that [they] cannot reasonably prepare a response." (Dkt. No. [4-1] at

5; Dkt. No. [13-1] at 5). First, Defendants argue that the Complaint [1] fails to

comply with Federal Rule of Civil Procedure 8(a)(2) because "[t]here is not a

scrap of information to show fraudulent intent;" no evidence proves that the

decline in Mr. Murphy's financial health was due to anything but the economy and his divorce; there is not sufficient detail about the transfer between CMS and ARM; and, "there is no such thing as a 'civil conspiracy.'" (Dkt. No. [4-1] at 6–7; Dkt. No. [13-1] at 6–7). Second, Defendants argue the Complaint [1] fails to comply with Federal Rule of Civil Procedure 9(b) because it "contains not a shred of information which would enable Defendant to determine why the property settlement was not 'equitable'" and there is not sufficient detail on the alleged transfer between CMS and ARM in which ARM served as a "shell." (Dkt. No. [4-1] at 7–8; Dkt. No. [13-1] at 8). Therefore, Defendants ask for "clarification as to the meaning of the term 'shell,' as well as supporting facts; … specifics as to why or how the transfer was 'fraudulent'; and how each of the Defendants benefits as a result of the alleged fraud." (Dkt. No. [4-1] at 8; Dkt. No. [13-1] at 8).

Plaintiffs respond that their Complaint [1] is sufficiently intelligible and detailed to permit a response. (Dkt. No. [21] at 7). Furthermore, Defendants' reliance on Rule 8(a)(2) is improper because no authority exists to indicate the Court should apply *Twombly*'s pleading standard to a Rule 12(e) motion. (Id. at 8). Finally, the facts included to support Plaintiffs' fraud claims, which must

AO 72A
(Rev.8/82)

comply with heightened pleading standard, are sufficiently detailed to satisfy

Rule 9(b) requirements. (Id. at 10–19).

Federal Rule of Civil Procedure 12(e) provides that "[a] party may move

for a more definite statement of a pleading to which a responsive pleading is

allowed but which is so vague or ambiguous that the party cannot reasonably

prepare a response." The Court holds that Plaintiffs' Complaint [1] is

"sufficiently detailed to permit a response." See Roy ex rel. Roy v. Fulton Cnty.

Sch. Dist., 509 F. Supp. 2d 1316, 1323 (N.D. Ga. 2007) (noting that although

the plaintiff's complaint was "not a model of clarity," the basis of the claim was

"not exceedingly vague or ambiguous, and the allegations supporting the claim

[were] sufficiently detailed to permit a response"). Defendants are certainly able

to respond in good faith and without prejudice to themselves. See Adelphia

Cable Partners, L.P. v. E & A Beepers Corp., 188 F.R.D. 662, 665 (S.D. Fla.

1999) ("A motion for more definite statement will only be granted where the

pleading is so vague or ambiguous that the opposing party cannot respond in

good faith or without prejudice to himself."). Indeed, the Complaint [1] is 42

pages long and includes 92 pages of attached exhibits that relate to Plaintiffs'

allegations. The specific facts that Defendants demand can be obtained through

discovery and are most likely to be within Defendants' control. Therefore,

10

Defendants CMS [4] and Mr. Murphy's [13] Motions for More Definite

Statement are **DENIED**.

## III.    Motions to Dismiss

A.    <u>Standard for Motion to Dismiss</u>

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a

"short and plain statement of the claim showing that the pleader is entitled to

relief." While this pleading standard does not require "detailed factual

allegations," "labels and conclusions" or "a formulaic recitation of the elements

of a cause of action will not do." <u>Ashcroft v. Iqbal</u>, __ U.S. __, 129 S. Ct. 1937,

1949 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).

To withstand a motion to dismiss, "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "

<u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 570). A complaint is plausible on its face

when the plaintiff pleads factual content necessary for the court to draw the

reasonable inference that the defendant is liable for the conduct alleged. <u>Id.</u>

(citing <u>Twombly</u>, 550 U.S. at 556).

At the motion to dismiss stage, "all well-pleaded facts are accepted as

true, and the reasonable inferences therefrom are construed in the light most

favorable to the plaintiff." <u>Bryant v. Avado Brands, Inc.</u>, 187 F.3d 1271, 1273

n.1 (11th Cir. 1999). However, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 129 S. Ct. at 1949). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S. Ct. at 1949. The court does not need to "accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

B.      FRCP 9(b)

Each Defendant argues that Plaintiffs failed to meet the Federal Rule of Civil Procedure 9(b) pleading standard. (Dkt. Nos. [3], [10], [12], [17], [23], [25], and [26]). Under Federal Rule of Civil Procedure 9(b), "a party [alleging fraud] must state with particularity the circumstances constituting fraud … . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Although there is a split within the Eleventh Circuit over the issue, the Northern District of Georgia has held that a heightened pleading standard under Rule 9(b) applies to all claims of actual fraud under the UFTA, but not constructive fraud claims. Compare Kipperman v. Onex Corp., No. 1:05-CV-1242-JOF, 2007 U.S. Dist. LEXIS 71551, at *17 (N.D. Ga. Sept. 26, 2007) (" … Rule 9(b) applies to all claims of intentional fraud, … but it does

12

not apply to claims of constructive fraud … .") <u>with</u> <u>Nesco, Inc. v. Cisco</u>, No. CV205-142, 2005 U.S. Dist. LEXIS 36189, at *8 (S.D. Ga. Oct. 7, 2005) ("[T]he Court concludes that the requirements of Rule 9(b) need not be met in an action for fraudulent conveyance." (footnote omitted)). Therefore, the Court assumes without deciding that Plaintiffs must meet the heightened standard for their actual fraud claims.[1]

Rule 9(b) is satisfied for actual fraud claims under the UFTA when a plaintiff submits:

> (1) an allegation of jurisdiction, (2) a statement of the date and the conditions of the indebtedness involved (often with the document itself attached), (3) the amount owed, (4) a statement that the defendant conveyed real and personal property of a given description to another for the purpose of defrauding [the] plaintiff and hindering and delaying the collection of the indebtedness described prior, and [(5)] a demand for judgment.

<u>Kipperman</u>, 2007 U.S. Dist. LEXIS 71551, at *18–19.

Plaintiffs' Complaint [1] properly alleges: jurisdiction, (Dkt. No. [1] at ¶¶ 1–18); a statement of the date and the conditions of the indebtedness involved, with nearly a hundred pages of documents attached, (<u>Id.</u> at ¶¶ 19–20); the amount owed, (<u>Id.</u> at ¶ 19); and a demand for judgment (<u>Id.</u> at 42).

---

[1]Because the Court holds that Plaintiffs meet the heightened pleading standard, whether or not Rule 9(b) should apply is inconsequential to the outcome of Defendants' motions to dismiss.

AO 72A
(Rev.8/82)

Furthermore, the Court finds that Plaintiffs also properly made against each Defendant a statement that the defendant conveyed or received real and personal property of a given description to another for the purpose of defrauding Plaintiffs and hindering and delaying the collection of the indebtedness. Mr. Murphy made the allegedly fraudulent transfers to his wife and was the catalyst for the allegedly fraudulent transfers between the various entities in this case. (Id. at ¶¶ 78, 90, 102, 114, 126, 139, 152).  Ms. Murphy divorced Mr. Murphy soon after Mr. Murphy repudiated his guarantees, and she received the marital residence and a substantial amount of other assets in the process even while they lived and worked together. (Id. at ¶¶ 42–50, 74–97). Carroll received a $986,000 personal loan within weeks of the Judgment. (Id. at ¶¶ 70–73, 101–121). As to Multifamily Housing, it loaned Carroll the $968,000 for the benefit of Mr. Murphy. (Id. at ¶¶ 70–73, 98–121). Soon after Mr. Murphy repudiated his guarantees, CMS transferred assets to ARM, and Gazebo Park was incorporated and received the Apartment Complex. (Id. at ¶¶ 53–55, 62–69, 122–159).

Lastly, Plaintiff has sufficiently alleged state of mind. In accordance with Rule 9(b), Alliant has alleged intent generally. (Id. at ¶¶ 40, 77–79, 89–91, 102, 114–15, 126–27, 139–40, 152–53, 162). Also, in determining actual intent,

O.C.G.A. § 18-2-74 provides that consideration may be given to a number of factors, often referred to as "badges of fraud."[2] Akanthos Capital Mgmt. v. Compucredit Holdings Corp., No. 1:10-CV-844-TCB, 2011 U.S. Dist. LEXIS 28568, at *39 (N.D. Ga. Mar. 15, 2011). Plaintiffs have alleged several facts that are badges of fraud, including, *inter alia*, that all but one of the transfers were to an "insider," all transfers were made after Mr. Murphy had repudiated the guarantees, and Mr. Murphy became insolvent after the transfers. (Dkt. No. [1] at ¶¶ 36–69). Therefore, Plaintiffs satisfy the heightened pleading standard

---

[2]Specifically, O.C.G.A. § 18-2-74(b) provides that the Court may consider, among other factors, whether:

(1) The transfer or obligation was to an insider;
(2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer or obligation was disclosed or concealed;
(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

15

for their actual fraud claims under the UFTA, and each defendant's motion to dismiss based upon Plaintiffs' satisfaction of Rule 9(b) is **DENIED**.

     C.    <u>FRCP 8(a)(2)</u>

Each Defendant also argues that Plaintiffs failed to meet the pleading standard under Federal Rule of Civil Procedure 8(a)(2). (Dkt. Nos. [3], [10], [12], [17], [23], [25], and [26]). Plaintiffs who bring an actual fraud claim under the UFTA "must show that (1) they are the Defendants' creditors; (2) Defendants made a transfer or incurred an obligation; and (3) Defendants did so with the actual intent to hinder, delay or defraud Plaintiffs." <u>Akanthos Capital Mgmt.</u>, 2011 U.S. Dist. LEXIS 28568, at *35 (footnote omitted) (citing O.C.G.A. § 18-2-74(a)(1)). To bring a constructive fraud claim, a plaintiff must show that the defendant

> (1) made a transfer or incurred an obligation (2) without "receiving a reasonably equivalent value in exchange for the transfer or obligation," and (3) either: (a) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; or (c) was insolvent at that time or became insolvent as a result of the transfer.

<u>Id.</u> at *44–45 (footnote omitted) (citations omitted).

16

The Court holds that Plaintiffs have sufficiently pleaded facts to make their UFTA claims plausible. As to the actual fraud claims, it is undisputed that Plaintiffs qualify as "creditors" under O.C.G.A. § 18-2-71(4) because they have brought a claim pursuant to the UFTA. See id. at *35–36 n.7 (finding that the plaintiffs are creditors under the UFTA because they "have brought 'claims' pursuant to the UFTA"). As to the second element, the UFTA defines a "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease, and creation of a lien or other encumbrance." O.C.G.A. § 18-2-71(12). Furthermore, a transfer occurs "when [a] transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien … that is superior to the interest of the transferee," except through the fraudulent transfer statute. O.C.G.A. § 18-2-76(1)(B). As already discussed, Plaintiffs have pleaded instances of allegedly fraudulent transfers for each Defendant. As to the third element, Plaintiff has alleged scienter generally and has, as already discussed, alleged several facts that are "badges of fraud."

As to the constructive fraud claims, Plaintiffs alleged that all Defendants made a transfer or incurred an obligation. (Dkt. No. [1] at ¶¶ 53–55, 62–69, 70–73, 78, 90, 98–159). Furthermore, they alleged that Defendants did not

receive a reasonably equivalent value in exchange for the transfers or obligations. (Id. at ¶¶ 44, 49, 79, 93, 103, 105, 115, 117, 129, 140, 142, 153, 155). Finally, Plaintiffs sufficiently alleged that the transactions occurred when Mr. Murphy reasonably should have believed that he would incur debts beyond his ability to pay as they became due or when he was insolvent, or that the transactions made Mr. Murphy insolvent. (Id. at ¶¶ 77, 79, 81–82, 89, 91, 93–94, 103, 105–06, 115, 117–18, 127, 129–30, 140, 142–43, 153, 155–56).

Therefore, because Plaintiffs pleaded the factual content necessary for the court to draw the reasonable inference that Defendants are liable for the conduct alleged, Plaintiffs' claims are plausible. Accordingly, each Defendant's motion to dismiss pursuant to Rule 8(a) is **DENIED**.

D.    Civil Conspiracy

Each Defendant also argues that the civil conspiracy claim under Count IX should be dismissed. (Dkt. Nos. [3], [10], [12], [17], [23], [25], and [26]). Defendants reason that (1) allegations in support of a civil conspiracy are conclusory and subject to dismissal under Rule 8(a), and (2) there is no separate cause of action for civil conspiracy under Georgia law. (Id.). Plaintiffs concede that alleging a civil conspiracy does not furnish a separate cause of action, but maintain that nothing prevents them from alleging conspiracy and that

18

conspiracy can be pleaded in general terms; furthermore, Plaintiffs characterize Defendants' actions as "irrational" considering all the circumstances and therefore sufficient to support an inference of a conspiracy. (Dkt. No. [10] at 18–20; Dkt. No. [20] at 18–20; Dkt. No. [28] at 13–16; Dkt. No. [29] at 15–16; Dkt. No. [30] at 16–17; Dkt. No. [31] at 12–13).

"A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." Mustaqeem-Graydon v. Suntrust Bank, 573 S.E.2d 455, 461 (Ga. Ct. App. 2002) (quoting First Fed. Sav. Bak v. Hart, 363 S.E.2d 832, 833 (Ga. Ct. App. 1987)). "To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort." Id. But, "[w]here civil liability for a conspiracy is sought to be imposed, the conspiracy itself furnishes no cause of action. The gist of the action is not the conspiracy alleged, but the tort committed against the plaintiff and the damage thereby done." Jones v. Spindel, 147 S.E.2d 615, 616 (Ga. Ct. App. 1966). When alleged, a conspiracy may be pleaded in general terms. Id.

Although Plaintiffs' claim for civil conspiracy does not furnish an independent cause of action on which to hold Defendants liable, it can be used to establish some of Defendants' liability for fraudulent transfers under the

19

UFTA. See Mustaqeem-Graydon, 573 S.E.2d at 461 (noting that civil co-conspirators may be held liable for damages caused). Therefore, Defendants' motions to dismiss Plaintiffs' civil conspiracy claim are **GRANTED** insofar as Plaintiffs allege a separate cause of action, but **DENIED** to the extent that a conspiracy may be alleged as a theory to support underlying tort liability.

> E.     Attorney's Fees

ARM and Carroll argue that the Court should dismiss Count X for attorney's fees. (Dkt. No. [25-1] at 13–14; Dkt. No. [26-1] at 13–14). This argument is meritless because a showing of intent or bad faith would entitle Plaintiffs to attorney's fees. See Tyler v. Lincoln, 527 S.E.2d 180, 183 (Ga. 2000) ("[E]very intentional tort invokes a species of bad faith that entitles a person wronged to recover the expenses of litigation including attorney fees." (quoting Ponce de Leon Condos. v. DiGirolamo, 232 S.E.2d 62, 64 (Ga. 1977))). Therefore, Defendants' motions to dismiss Plaintiffs' claim for attorney's fees are **DENIED**.

> F.     FRCP 5.2

Mr. Murphy and CMS understandably take issue with Plaintiffs including confidential information in the Complaint [1], but this issue is **MOOT** because

Exhibit F is sealed. The Court does not find that this inadvertent and remedied error supports dismissal.

### Conclusion

For the aforementioned reasons, Defendants' Motions to Dismiss Complaint, (Dkt. Nos. [3], [10], [12], [17], [23], [25], and [26]), are **GRANTED in part** and **DENIED in part**; Defendants' Motions for More Definite Statement, (Dkt. Nos. [4] and [13]), are **DENIED**; and Plaintiffs' Motions to Strike Defendants Carroll [35] and ARM's [36] Reply Briefs are **GRANTED**. Defendants shall respond to Plaintiffs' Complaint [1] in accordance with the Federal Rules of Civil Procedure.


**SO ORDERED**, this _26th_ day of July, 2011.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)