IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALLIANT TAX CREDIT FUND 31-a, LTD., et al., :<br><br>    Plaintiffs, :<br>:<br>v. :<br>:<br>M. VINCENT MURPHY, III, et al., :<br>:<br>    Defendants. | CIVIL ACTION NO.<br>1:11-CV-0832-RWS |

## **ORDER**

This case is before the Court on Plaintiffs' Motion for Summary Judgment [240]. After reviewing the record and the Parties' submissions, the Court enters the following Order.

### Background[1]

*Kentucky Projects and Litigation*

Alliant Capital, Inc. is a syndicator that matches investors with developers using limited partnerships. In 2003 and 2004, Plaintiffs entered into six limited partnership agreements with Vince Murphy (and others) to develop

---

[1] Unless otherwise noted, the facts are undisputed and are taken from the Parties' respective statements of material facts.

AO 72A
(Rev.8/82)

and operate six low-income apartment buildings in Kentucky ("Kentucky Projects" or "Projects"). Alliant's standard practice was to perform due diligence on proposed developments and developers. Accordingly, Plaintiffs conducted a review of Vince Murphy's financial statements, bank accounts, assets, and business record.

Vince Murphy executed guaranty agreements for each of the apartment complexes. He promised to satisfy all payment and performance obligations of the general partners under the Kentucky Projects' limited partnerships. In conjunction with the guaranty agreements, Vince Murphy submitted certified financial statements, along with affidavits swearing that the financial statements were accurate. In April 2004, Vince Murphy listed his net worth at $25,479,550. (2004 Vince Murphy Fin. Statement, [234-4] Ex. 4.) According to his 2006 statement, Vince's net worth was $27,127,155. (2006 Vince Murphy Fin. Statement, [234-6] Ex. 9.)

By 2005, the Kentucky Projects were experiencing construction cost overruns. (McMaster Depo., [234-5] at 2 of 41.) At some point that year, Vince began funding construction out of his own pocket. (Vince Murphy Depo., [234-6] at 3-4 of 6.) But in December 2006, Vince refused to further

2

fund the Kentucky Projects or the Projects' construction loans. In April 2007, after declaring the loans in default, Bank of America sued to foreclose on all of the Kentucky Project apartment buildings. At that point, there were past due balances of over $10 million on the limited partnerships' loans from Bank of America, one of the apartment buildings had not been constructed at all, and there were unpaid liens on all of the buildings.

Plaintiffs filed suit for breach of contract on November 20, 2007, in the United States District Court for the Eastern District of Kentucky. None of the general partners for the Kentucky Projects filed an answer to Plaintiffs' complaint and the court declared them in default. On September 30, 2009, the Kentucky court granted summary judgment to Plaintiffs on the issue of Vince Murphy's liability under the guaranty agreements. (See Order, [234-11].) On March 22, 2010, the Kentucky court awarded $8,946,643 in damages to Plaintiffs. Vince Murphy appealed the Kentucky court's order and judgment, but on August 15, 2012, the United States Court of Appeals for the Sixth Circuit affirmed the trial court's decision.

*Asset Transfers by Vince Murphy*

1.   Marital Transfers

3

Between September 2006 and February 2007, Vince Murphy sold stocks and withdrew funds from multiple investing accounts. (See [234-12], Ex.s 18-21.) On February 16, 2007, he wrote two checks with the proceeds (one for $50,000 and one for $500,000) to his then-wife, Marilyn Murphy. ([234-12] Ex. 22.) That same day, Marilyn opened two BB&T accounts (ending in -6791 and -7167) in her own name and deposited the $550,000 from Vince. ([234-12], Ex. 22.)

On February 22, 2007, Vince Murphy filed papers with the Georgia Secretary of State to form three limited liability companies: Gazebo Park Apartments of Acworth LLC, Autumn Hills Apartments of Union City LLC, and Sandpiper Apartments of Casselberry LLC. ([234-13] Ex. 23.) Marilyn Murphy was listed as the Managing Member of all three entities in the Articles of Organization. ([234-13] Ex. 23.) She and her four children were each given a twenty percent ownership interest in the entities, but Marilyn testified that she put no money into them. (Marilyn Murphy Depo., [234-13] at 19 of 36.)

Vince Murphy wrote checks to each of the entities on February 23, 2007, in the amount of $102,400. ([234-13] Ex. 26.) He transferred an additional $100,000 to each entity on February 26. ([234]-13] Ex. 23.) On April 30,

4

2007, Vince Murphy transferred ownership of three apartment complexes (Sandpiper, Auburn Hills, and Park Bridge) to the newly-formed LLCs managed by Marilyn Murphy.[2]  (See, 2006 Vince Murphy Fin. Statement, [234-12] Ex. 19; Closing Statements, [234-13] Ex. 28.)  On his 2006 financial statement, Vince Murphy valued the apartment complexes at $24,110,000, with mortgage balances totaling $16,229,893.  (2006 Vince Murphy Fin. Statement, [234-12] Ex. 19.)  The following month, Vince deeded his interest in the marital residence at 410 Society Street to Marilyn Murphy.  Then, on November 13, 2007, Vince wrote a check to Marilyn for $288,000.

On November 16, 2007, Vince and Marilyn Murphy executed a Marital Settlement Agreement ("MSA").  (MSA, [234-12] Ex. 17.)  Four days later, the same day the Kentucky action was filed,[3] Vince and Marilyn Murphy filed for an uncontested divorce.  A Decree of Divorce incorporating the MSA was entered in the Superior Court of Fulton County on January 9, 2008.

---

[2] The Court notes Marilyn Murphy's reoccurring point that up until her divorce from Vince, she had a half interest in all of the marital property.

[3] Marilyn Murphy swears that she had no knowledge of Plaintiffs or the Kentucky litigation until 2009.

5

Under the MSA, Marilyn Murphy received:

- 160,000 shares of Coca-Cola Company stock valued (at the time) at $10,019,200, plus a quarterly dividend of .34 cents per share;

- Cash from Vince Murphy in the amount of $579,459 ($563,959 of which was transferred to Marilyn in February 2007 after Vince liquidated his non-Coca-Cola securities and investment funds);

- IRA in the amount of $100,600;

- The marital residence valued at $562,000 (which had already been conveyed to Marilyn in March 2007);

- Furniture and effects from the marital residence valued at $368,960;

- Mountain cabin located at 346 Ridge Circle valued at $290,000;

- Furniture and effects from the mountain cabin valued at $37,259; and

- Ford Explorer and Chevrolet Suburban valued at $26,569.

Under the MSA, Vince retained his ownership interest in all of his business entities (fifteen separate entities are listed in the MSA). Marilyn quitclaimed to Vince any and all interest she may have held in the entities.

6

Vince agreed under the MSA to indemnify Marilyn Murphy for any liability arising out of the operation or financing of any of his businesses, including the Kentucky Projects.

Vince also received two IRAs, a pension account, and $1,095,601 from six separate bank accounts under the MSA.  However, it appears that at least some of the account balances listed in the MSA differed from the actual balances on November 16, 2007 (e.g., Bank of America account - 2164 had an actual balance of $.04, not $1,905; Wachovia account -8276 had an actual balance of $52,067, not $736,682.)  The MSA listed Wachovia account -5621 as having a balance of $8,459, but on December 5, 2007, Vince Murphy withdrew $100,000 from that account and deposited it into a different Wachovia account.

Between September and November 2007, Vince Murphy transferred $288,000 in cash to Marilyn Murphy, loaned $20,000 to one of his companies, and gave his daughter $48,000 for her wedding.  In late 2007 and January 2008, Vince made *numerous* transfers of cash between his various bank accounts, trust accounts, and business entities.  (See Pl.s' SMF, [234-1] ¶¶ 62-75.)  Ultimately, on January 9, 2008, Vince transferred $900,000 in cash to Marilyn

7

Murphy. Vince made at least three other large cash transfers to Marilyn in 2008 and 2009: $330,000 in February 2008 from a joint bank account, $192,000 in April 2008 (check payable to Acorn Landing Marilyn Murphy), and $180,000 in July 2009 (check payable to Acorn Landing Marilyn Murphy).

Both Vince and Marilyn waived all types of alimony and medical coverage under the MSA. In November 2007, Vince hired Marilyn to work at Community Management Services ("CMS"), one of Vince's businesses, and paid her a salary of $2,500 every two weeks. CMS also paid for Marilyn's health insurance. Marilyn no longer works for CMS. Vince Murphy has multiple life insurance policies, but he has no ownership interest in the policies; they are solely for the benefit of Marilyn Murphy. On February 27, 2011, Vince married Kay Pritchett Talalia. On his 2011 tax return Vince Murphy claimed $52,340 in income.

2. Other Transfers

In early 2007, Vince Murphy decided to restructure CMS into a minority business enterprise so that it would be better positioned to compete for government contracts. To that end, he created Affordable Realty Management, Inc. ("ARM"), which was owned primarily by minorities, including women

8

who had worked for him for years and his then-wife, Marilyn.  As CMS contracts expired, Vince's clients signed new contracts with ARM and CMS reduced its operations.

In early 2009, Vince was approached by Patrick Carroll, a real estate investor, who expressed interest in acquiring ARM.  Vince negotiated a contract to sell ARM to Carroll for $900,000.  Carroll then wanted to purchase a second property management company (The Hediger Company) and he approached Vince for a loan.  Through one of his companies, Multi Family Housing Developers, Inc. ("MFH"), Vince made the loan and Carroll signed a promissory note for approximately $986,000.

Carroll ultimately defaulted on his loan and MFH filed suit for $901,407 in Fulton County Superior Court.  Before an order was entered by the state court, Carroll entered into a settlement agreement with MFH for a sum higher than the original loan, plus attorney fees, expenses of litigation, and interest.  Since then, Carroll has made all payments required by the settlement agreement (significantly more than required by the original note).[4]

---

[4] Carroll and ARM were initially named as Defendants in this action.  However, Plaintiffs dismissed them with prejudice and they are no longer parties.

AO 72A
(Rev.8/82)

In the present suit, Plaintiffs allege that Vince Murphy made several fraudulent conveyances to avoid paying the Kentucky court's judgment against him. Specifically, the Complaint[5] alleges: fraudulent transfer of the marital residence from Vince to Marilyn (Count I); fraudulent transfer of marital assets from Vince to Marilyn (Count II); fraudulent transfer of the Carroll loan to Multifamily Housing Developers, LLC (Count IV); fraudulent transfer of Community Management Services, Inc. assets to Affordable Realty Management (Count V); fraudulent transfer of apartment complex to Gazebo Park Apartments of Acworth, LLC (Count VII); and civil conspiracy amongst all Defendants (Count IX). Plaintiffs now move for summary judgment on all counts against all Defendants.

## Discussion

### I.   Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The moving

---

[5] This Motion for Summary Judgment pre-dates the filing of Plaintiffs' Amended Complaint [244]. Two claims from the Original Complaint do not appear in the Amended Complaint and are thus no longer at issue.

party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296

(11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## II.     Analysis

The transfers by Vince Murphy at issue are: the marital residence to Marilyn Murphy, marital assets (e.g., mountain cabin, furniture, stock, life insurance) to Marilyn Murphy, the Carroll loan to MFH, CMS assets to ARM, and the apartment complex to Gazebo Park Apartments of Acworth, LLC. Under the Georgia Uniform Fraudulent Transfers Act ("GUFTA"), O.C.G.A. § 18-2-74(a)*:*

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1)   With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2)   Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> > (A)   Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > (B)   Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

In support of their motion for summary judgment, Plaintiffs argue there is no dispute that Vince Murphy transferred substantially all of his assets to his ex-wife and children, without consideration, to avoid paying the Kentucy court's judgment against him.  (See generally, Pl.s' MSJ Br. [234].)  The Court agrees with Defendants, however, that material fact questions exist as to whether

13

Vince's transfers violated GUFTA and whether Defendants engaged in a civil conspiracy to defraud Plaintiffs.

GUFTA lists eleven factors which may be considered to determine whether a debtor had actual intent to defraud a creditor. O.C.G.A. § 18-2-74(b). Among those factors are: whether the debtor transferred "substantially all" of his assets; whether the debtor received consideration "reasonably equivalent to the value of the asset transferred;" whether the debtor was insolvent or became insolvent after making the transfer; whether the transfer was concealed; and whether the debtor retained control of the assets after the transfer. O.C.G.A. § 18-2-74(b). Plaintiffs maintain that nine of the eleven factors apply to the transfers at issue here, and therefore the transfers were fraudulent as a matter of law. (Pl.s' MSJ Br., [234] at 20-22 of 28.)

As Defendants note, however, whether a transfer was made with the intent to defraud creditors "is a question of fact for the jury to decide from all of the circumstances of the case." Goodman v. Lewis, 277 S.E.2d 908, 910 (Ga. 1981). Likewise, what constitutes "reasonably equivalent value" and whether the debtor is solvent or insolvent at the time of the transfer are questions of fact for the jury. Id.; Gillespie v. Sand-Rock Transit, Inc., 665 S.E.2d 385, 385 (Ga.

14

Ct. App. 2008) ("It is the longstanding rule in this state that certain issues of fact, such as insolvency and intent, are for the jury in actions to set aside a fraudulent transfer . . . ."); In re Chase & Sandborn Corp., 904 F.2d 588, 593 (11th Cir. 1990) ("It has long been established that whether fair consideration has been given for a transfer is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts.") (internal quotations and citation omitted).

Here, Defendants point to evidence that Vince received some value in exchange for the subject transfers.  For instance, even though Vince transferred the marital residence and various assets to Marilyn under the Divorce Decree, he received assets as well: retained ownership interest in his businesses, cash, IRA and pension accounts, a car, and waiver of Marilyn's claim to alimony. (Divorce Decree, [234-12] Ex. 17.)  Based on his 2006 financial statement, Vince received approximately 46% of the couple's property value in the divorce.  (2006 Vince Murphy Fin. Statement, [234-6] Ex. 9.)  Regarding the apartment complex transfer to Gazebo Park Apartments, Vince testified that it was a refinancing opportunity for which he received a tax benefit, relief from prepayment penalties on the original loan, and release from $6.3 million in

15

mortgage debt. (Vince Murphy Depo., [241-4] at 168 of 244.) Thus, there are material questions about whether Vince received reasonably equivalent value for these transfers and whether he intended to defraud Plaintiffs when he made them.

Although Plaintiffs move for summary judgment on all counts against all Defendants, Plaintiffs' motion and statement of material facts lack any discussion of or factual allegations pertaining to Counts IV (Carroll loan transfer to MFH) and V (transfer of CMS assets to ARM). In his own statement of additional facts, Vince Murphy asserts that there was no transfer of assets between CMS and ARM; rather, as CMS's contracts expired, ARM took over CMS's business. (Vince Murphy SAMF, [254-1] ¶ 27.] ) Vince alleges that he created ARM as a minority-owned business so it would be well positioned to compete for government contracts and to reward his minority employees from CMS. (Id. ¶¶ 25-26.) Vince further alleges that the Carroll loan was made through MFH, and MFH continues to receive payments from Carroll, pursuant to the Fulton County Superior Court's order. (Id. ¶¶ 29-31.) Plaintiffs raise no objection to these allegations other than to claim they are not material to Plaintiffs' motion. (See Pl.s' Resp. to Vince Murphy SAMF, [268].) However,

16

the Court finds these allegations are material to determining whether these "transfers" violate GUFTA (if indeed any transfers occurred).

Marilyn Murphy asserts, and Plaintiffs do not dispute, that the success of Plaintiffs' civil conspiracy claim and request for litigation expenses and attorney's fees (Counts IX and X) depend upon the success of the underlying fraudulent conveyance claims. (Marilyn Murphy Resp., [256] at 22.) Indeed, Plaintiffs have not put forward any independent argument or facts pertaining to Counts IX or X. The Court finds that material factual disputes exist regarding the allegedly fraudulent transfers by Vince Murphy. Therefore, summary judgment is denied as to all counts.

## Conclusion

Based on the foregoing, Plaintiffs' Motion for Summary Judgment [240] is **DENIED.**

**SO ORDERED**, this  14th  day of April, 2014.

_____
**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)