IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ALLIANT TAX CREDIT FUND          :
31-A, LTD., et al.,              :
                                 :
     Plaintiffs,               :
                                 :          CIVIL ACTION NO.
v.                               :          1:11-CV-0832-RWS
                                 :
M. VINCENT MURPHY III, et al.,   :
                                 :
     Defendants.               :

## <u>ORDER</u>

     This case is before the Court on Marilyn Murphy's Motion for Partial

Summary Judgment [295]; Plaintiffs' Motion for Partial Summary Judgment

[297]; and Community Management Services, Inc., Multifamily Housing

Developers, LLC, and Vince Murphy's Second Motion for Summary Judgment

[339][1].  After reviewing the record and the Parties' submissions, the Court

enters the following Order.

## Background[2]

---

     [1] This second motion for summary judgment [339] incorporates by reference an earlier motion for summary judgment filed by the same Parties [296].

     [2] Unless otherwise noted, the facts are undisputed and are taken from the Parties' respective statements of material facts.

AO 72A
(Rev.8/82)

*Kentucky Projects and Litigation*

Alliant Capital, Inc. is a syndicator that matches investors with developers using limited partnerships as ownership entities. In 2003 and 2004, Plaintiffs entered into six limited partnership agreements with Vince Murphy (and others) to develop and operate six low-income apartment buildings in Kentucky ("Kentucky Projects" or "Projects"). The six limited partnerships had the same basic structure. The Renaissance Apartments on Kentucky ("Renaissance") was one of the limited partnerships. For ease of reference, Renaissance will be described and referenced throughout as a representative example of the six agreements between Plaintiffs and Vince Murphy.

Vince Murphy and an individual named Robert A. McMaster ("McMaster') were equal co-owners of Warren County Community Housing, LLC, which was the general partner of Renaissance. The general partner was responsible for the day-to-day management and control of the limited partnership. Plaintiffs were limited partners and only made capital contributions to Renaissance.

Plaintiffs' standard practice was to perform "due diligence" on proposed developments and developers. Accordingly, Plaintiffs conducted a review of

2

Vince Murphy's financial statements, bank accounts, assets, and business record. They also required Vince Murphy to sign personal guarantees as to certain obligations of the limited partnerships.

Vince Murphy, McMaster and Atlin Construction, LLC (the general contractor for the Kentucky Projects, which was co-owned by Vince Murphy and McMaster), executed guaranty agreements with Plaintiffs for each of the apartment complexes. The guarantors promised to satisfy all payment and performance obligations of the general partners under the Kentucky Projects' limited partnerships. In conjunction with the guaranty agreements, Vince Murphy submitted certified financial statements, along with affidavits swearing that the financial statements were accurate. In April 2004, Vince Murphy listed his net worth at $25,479,550. (2004 Vince Murphy Fin. Statement, [234-4] Ex. 4.) By signing the financial statement, Vince Murphy signified that he understood Plaintiffs were relying on the information therein to make investment and financing decisions, and Vince agreed to notify Plaintiffs immediately of any material adverse change in his financial condition. (2004 Vince Murphy Fin. Statement Certification, [234-4] Ex. 4.)

3

In 2005, the Kentucky Projects (particularly Renaissance) were experiencing construction cost overruns.  (McMaster Depo., [234-5] at 2 of 41.) Beginning in the summer of 2005, Vince Murphy and McMaster attempted to modify their financial arrangement with Plaintiffs in order to secure more equity for the Renaissance Project.  (McMaster Depo., [234-5] at 2-3, 8-9 of 41.)  At some point in 2005, Vince Murphy began financing construction out of his own pocket.  (Vince Murphy Depo., [234-6] at 3-4 of 6.)  McMaster testified that Vince Murphy loaned money to a company called Omni Mortgage (co-owned by Vince Murphy and McMaster), and then Omni loaned the money to Atlin Construction, which covered Renaissance's payroll.  (McMaster Depo., [234-5] at 8-9 of 41.)  Vince Murphy testified, however, that he loaned approximately $1.5 million to McMaster personally to complete construction on the Renaissance Project.  (Vince Murphy Depo., [234-6] at 3 of 6.)  In November 2005, Plaintiffs decided that they would not restructure their financing for the Projects.  (McMaster Depo., [234-5] at 9 of 41.)  According to McMaster's testimony, in December, he and Vince Murphy made the decision to stop paying their subcontractors and they all walked off the job.  (McMaster Depo., [234-5] at 9 of 41.)

4

Throughout 2006, Vince Murphy and McMaster looked for new investors to buy out Plaintiffs and Bank of America (the construction lender) from the Kentucky Projects.  (McMaster Depo., [234-5] at 10-12 of 41.)  In connection with that endeavor, Vince Murphy submitted updated personal financial statements.  (2006 Vince Murphy Fin. Statement, [234-6] Ex. 9.)  According to his 2006 statement, Vince Murphy's net worth was $27,127,155.  (2006 Vince Murphy Fin. Statement, [234-6] Ex. 9.)  Vince and McMaster's efforts to find a new backer for the Projects were unsuccessful.  As of December 2006, Vince Murphy refused to fund the Kentucky Projects or the construction loans.

Between July 2006 and April 2007, at least 50 written demands for performance under the guaranty agreements, notices of default, and notices of removal of the Projects' general partners were sent to Vince Murphy.  However, Vince Murphy testified that he does not recall receiving a single written notice. In April 2007, after declaring the loans in default, Bank of America sued to foreclose on all of the apartment buildings comprising the Kentucky Projects. At that point, there were past due balances of over $10 million on the limited partnerships' loans from Bank of America, one of the apartment buildings

5

(Renaissance) had not been constructed at all, and there were unpaid liens on all of the buildings.

Plaintiffs filed suit for breach of contract on November 20, 2007, in the United States District Court for the Eastern District of Kentucky .  None of the general partners for the Kentucky Projects filed an answer to Plaintiffs' complaint and the court declared them in default.  On September 30, 2009, the Kentucky court granted summary judgment to Plaintiffs on the issue of Vince Murphy and McMaster's liability under the Guaranty Agreements.  (See Order, [234-11].)  On March 22, 2010, the Kentucky court awarded $8,946,643 in damages to Plaintiffs.  Vince Murphy, McMaster, Ironwood Development (the Projects' developer) and each of the Kentucky Project general partners were found jointly and severally liable for the judgment.  Vince Murphy appealed the Kentucky court's judgment, but on August 15, 2012, the United States Court of Appeals for the Sixth Circuit affirmed the trial court's decision.

*Asset Transfers by Vince Murphy*

1.     Marital Transfers and the Marital Settlement Agreement

Between September 2006 and February 2007, Vince Murphy sold stocks and withdrew funds from multiple investing accounts.  (See [234-12], Ex.s 18-

6

21.)  On February 16, 2007, he wrote two checks with the proceeds (one for $50,000 and one for $500,000) to his then-wife, Marilyn Murphy.  ([234-12] Ex. 22.)  That same day, Marilyn opened two BB&T accounts (ending in -6791 and -7167) in her own name and deposited the $550,000 from Vince Murphy. ([234-12], Ex. 22.)

On February 22, 2007, Vince Murphy filed papers with the Georgia Secretary of State to form three limited liability companies: Gazebo Park Apartments of Acworth LLC, Autumn Hills Apartments of Union City LLC, and Sandpiper Apartments of Casselberry LLC.  ([234-13] Ex. 23.)  Marilyn Murphy was listed as the Managing Member of all three entities in the Articles of Organization.  ([234-13] Ex. 23.)  She and her four children were each given a twenty percent ownership interest in the entities, but Marilyn testified that she put no money into them.  (Marilyn Murphy Depo., [234-13] at 19 of 36.)

Vince Murphy wrote checks to each of the entities on February 23, 2007, in the amount of $102,400.  ([234-13] Ex. 26.)  He transferred an additional $100,000 to each entity on February 26.  ([234]-13] Ex. 23.)  On April 30, 2007, Vince Murphy transferred ownership of three apartment complexes (Sandpiper, Auburn Hills, and Park Bridge) to the newly-formed LLCs

7

managed by Marilyn Murphy.[3]  (See, 2006 Vince Murphy Financial Statement,

[234-12] Ex. 19; Closing Statements, [234-13] Ex. 28.)  On his 2006 Financial

Statement, Vince Murphy valued the apartment complexes at $24,110,000, with

mortgage balances totaling $16,229,893.  (2006 Vince Murphy Financial

Statement, [234-12] Ex. 19.)  The following month, Vince Murphy deeded his

interest in the marital residence at 410 Society Street to Marilyn Murphy.  Then,

on November 13, 2007, Vince Murphy wrote a check to Marilyn Murphy for

$288,000.

On November 16, 2007, Vince and Marilyn Murphy executed a Marital

Settlement Agreement ("MSA").  (MSA, [234-12] Ex. 17.)  Four days later, the

same day the Kentucky action was filed,[4] Vince and Marilyn Murphy filed for

an uncontested divorce.  A Decree of Divorce incorporating the MSA was

entered in the Superior Court of Fulton County on January 9, 2008.

Under the MSA, Marilyn Murphy received:

---

[3] The Court notes Marilyn Murphy's reoccurring point that up until her divorce from Vince, she had a half interest in all marital property.

[4] Marilyn Murphy swears that she had no knowledge of Plaintiffs or the Kentucky litigation until she was served with a subpoena in October 2010.

- 160,000 shares of Coca-Cola Company stock valued (at the time) at $10,019,200, plus a quarterly dividend of .34 cents per share;

- Cash from Vince Murphy in the amount of $579,459 ($563,959 of which was transferred to Marilyn in February 2007 after Vince liquidated his non-Coca-Cola securities and investment funds);

- IRA in the amount of $100,600;

- The marital residence valued at $562,000 (which had already been conveyed to Marilyn in March 2007);

- Furniture and effects from the marital residence valued at $368,960;

- Mountain cabin located at 346 Ridge Circle valued at $290,000;

- Furniture and effects from the mountain cabin valued at $37,259; and

- Ford Explorer and Chevrolet Suburban valued at $26,569.

Under the MSA, Vince retained his ownership interest in all of his business entities (fifteen separate entities are listed in the MSA) and Marilyn quitclaimed to Vince any and all interest she may have held in the entities. Vince agreed under the MSA to indemnify Marilyn Murphy for any liability

9

arising out of the operation or financing of any of his businesses, including the Kentucky Projects.

Vince also received two IRAs, a pension account, and $1,095,601 from six separate bank accounts under the MSA. However, it appears that at least some of the account balances listed in the MSA differed from the actual balances on November 16, 2007 (e.g., Bank of America account - 2164 had an actual balance of $.04, not $1,905; Wachovia account -8276 had an actual balance of $52,067, not $736,682.) The MSA listed Wachovia account -5621 as having a balance of $8,459, but on December 5, 2007, Vince Murphy withdrew $100,000 from that account and deposited it into a different Wachovia account.

Both Vince and Marilyn waived all types of alimony and medical coverage under the MSA. In November 2007, however, Vince hired Marilyn at Community Management Services ("CMS"), one of his companies, and paid her a salary of $2,500 every two weeks. CMS also paid for Marilyn's health insurance.[5]

---

[5] Marilyn no longer works for CMS.

10

Between September and November 2007, Vince Murphy transferred $288,000 in cash to Marilyn Murphy, loaned $20,000 to one of his companies, and gave his daughter $48,000 for her wedding.  In late 2007 and January 2008, Vince made *numerous* transfers of cash between his various bank accounts, trust accounts, and business entities.  (See Pl.s' SMF, [234-1] ¶¶ 62-75.)  On January 9, 2008, the same day the Murphys' divorce was finalized, Vince transferred $900,000 in cash to Marilyn Murphy, which she used to purchase an additional 20,000 shares of Coca-Cola stock.  Vince made at least three other large cash transfers to Marilyn in 2008 and 2009: $330,000 in February 2008 from a joint bank account, $192,000 in April 2008 (check payable to Acorn Landing Marilyn Murphy), and $180,000 in July 2009 (check payable to Acorn Landing Marilyn Murphy).

Vince Murphy has multiple life insurance policies, but he has no ownership interest in the policies; they are solely for the benefit of Marilyn Murphy.  From October 2009 until March 2010, Marilyn made payments to Stan Kreimer, Vince's counsel in this matter (the checks were from Marilyn Murphy Acorn Landing).  ([234-28] Ex. 70.)  On February 27, 2011, Vince

AO 72A
(Rev.8/82)

married Kay Pritchett Talalia.  On his 2011 tax return Vince Murphy claimed $52,340 in income.

2.      Other Transfers at Issue

    In early 2007, Vince Murphy decided to restructure CMS into a minority business enterprise so that it would be better positioned to compete for government contracts.  To that end, he created Affordable Realty Management, Inc. ("ARM"), which was owned primarily by minorities, including women who had worked for him for years and his then-wife, Marilyn.  As CMS contracts expired, Vince's clients signed new contracts with ARM and CMS reduced its operations.

    In early 2009, Vince was approached by Patrick Carroll, a real estate investor, who expressed interest in acquiring ARM.  Vince negotiated a contract to sell ARM to Carroll for $900,000.  Carroll then wanted to purchase a second property management company (The Hediger Company) and he approached Vince for a loan.  Through one of his companies, Multi Family Housing Developers, Inc. ("MFH"), Vince made the loan and Carroll signed a promissory note for approximately $986,000.

12

Carroll ultimately defaulted on the loan and MFH filed suit for $901,407 in Fulton County Superior Court.  Before an order was entered by the state court, Carroll entered into a settlement agreement with MFH for a sum higher than the original loan, plus attorney fees, expenses of litigation, and interest. Since then, Carroll has made all payments required by the settlement agreement (significantly more than required by the original note).[6]

In the present suit, Plaintiffs allege that Vince Murphy made several fraudulent transfers to avoid paying the Kentucky court's judgment. Specifically, the Amended Complaint alleges: fraudulent transfer of the marital residence to Marilyn (Count I); fraudulent transfer of other marital assets to Marilyn (Count II); fraudulent pre-divorce cash transfers to Marilyn (Count III); fraudulent post-divorce transfers to Marilyn (Count IV); fraudulent transfer of the Carroll Loan to Multifamily Housing Developers, LLC (Count V); fraudulent transfer of Community Management Services, Inc. assets to Affordable Realty Management (Count VI); fraudulent transfer of an apartment complex to Gazebo Park Apartments of Acworth, LLC (Count VII); and civil

_____

[6] Carroll and ARM were initially named as Defendants in this action. However, Plaintiffs dismissed them with prejudice and they are no longer parties.

conspiracy amongst all Defendants (Count VIII).  Plaintiffs seek attorneys' fees (Count IX) and punitive damages (Count X) against all Defendants.

**Discussion**

**I.      Summary Judgment Legal Standard**

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

15

## II.    Georgia Uniform Fraudulent Transfers Act

Several provisions of the Georgia Uniform Fraudulent Transfers Act

("GUFTA"), O.C.G.A. § 18-2-70, *et seq.*, are operative in this case.  First,

under O.C.G.A. § 18-2-74*:*

> (a)  A transfer made or obligation incurred by a debtor
> is fraudulent as to a creditor, whether the creditor's
> claim arose before or after the transfer was made or
> the obligation was incurred, if the debtor made the
> transfer or incurred the obligation:
>
> (1)    With actual intent to hinder, delay, or defraud
> any creditor of the debtor; or
>
> (2)    Without receiving a reasonably equivalent
> value in exchange for the transfer or obligation,
> and the debtor:
>
> (A)    Was engaged or was about to engage in a
> business or a transaction for which the
> remaining assets of the debtor were
> unreasonably small in relation to the
> business or transaction; or
>
> (B)    Intended to incur, or believed or
> reasonably should have believed that he
> or she would incur, debts beyond his or
> her ability to pay as they became due.

GUFTA lists eleven factors which may be considered to determine whether a

debtor had actual intent to defraud a creditor.  O.C.G.A. § 18-2-74(b).  Among

16

those factors are: whether the debtor transferred "substantially all" of his assets;

whether the debtor received consideration "reasonably equivalent to the value

of the asset transferred;" whether the debtor was insolvent or became insolvent

after making the transfer; whether the transfer was concealed; and whether the

debtor retained control of the assets after the transfer.  O.C.G.A. § 18-2-74(b).

Second, under O.C.G.A. § 18-2-75,

> (a) A transfer made or obligation incurred by a debtor
> is fraudulent as to a creditor whose claim arose before
> the transfer was made or the obligation was incurred if
> the debtor made the transfer or incurred the obligation
> without receiving a reasonably equivalent value in
> exchange for the transfer or obligation and the debtor
> was insolvent at that time or the debtor became
> insolvent as a result of the transfer or obligation.
>
> (b) A transfer made by a debtor is fraudulent as to a
> creditor whose claim arose before the transfer was
> made if the transfer was made to an insider for an
> antecedent debt, the debtor was insolvent at that time,
> and the insider had reasonable cause to believe that
> the debtor was insolvent.

Whether a transfer was made with the intent to defraud creditors "is a

question of fact for the jury to decide from all of the circumstances of the case."

Goodman v. Lewis, 277 S.E.2d 908, 910 (Ga. 1981).  Likewise, what

constitutes "reasonably equivalent value" and whether the debtor is solvent or

17

insolvent at the time of a transfer are questions of fact for the jury.  Id.;

Gillespie v. Sand-Rock Transit, Inc., 665 S.E.2d 385, 385 (Ga. Ct. App. 2008)

("It is the longstanding rule in this state that certain issues of fact, such as

insolvency and intent, are for the jury in actions to set aside a fraudulent

transfer . . . ."); In re Chase & Sandborn Corp., 904 F.2d 588, 593 (11th Cir.

1990) ("It has long been established that whether fair consideration has been

given for a transfer is largely a question of fact, as to which considerable

latitude must be allowed to the trier of the facts.") (internal quotations and

citation omitted).

**III.    Marilyn Murphy's Motion for Partial Summary Judgment [295]**

Marilyn Murphy moves for partial summary judgment on Counts I, II,

III, IV, IX and X of the Amended Complaint.

A.      Count I: Marital Residence Transfer

1.      *Claim under § 18-2-75(b)*

Marilyn Murphy argues that Count I should be dismissed in part because

it is time-barred under O.C.G.A. § 18-2-79(3)[7].  Section 18-2-79(3)

---

[7] Section 18-2-79 reads:

A cause of action with respect to a fraudulent transfer or

extinguishes all fraudulent transfer claims asserted under § 18-2-75(b) that are

brought more than one year after the transfer was made.  Count I asserts a claim

under §§ 18-2-74 and 18-2-75.  (Am. Compl., [244] ¶¶ 82-90.)  Ms. Murphy's

present argument applies only to Plaintiffs' claim under § 18-2-75(b).

Marilyn Murphy notes that, unlike § 18-2-79(1), there is no "discovery"

provision under § 18-2-79(3).  Thus, she argues, § 18-2-79(3) should be

interpreted as a statute of repose, not a statute of limitations.  "[A] statute of

repose is . . . distinct from a statute of limitation in that a statute of repose

stands as an unyielding barrier to a plaintiff's right of action.  The statute of

---

obligation under this article is extinguished unless action
is brought:

(1) Under paragraph (1) of subsection (a) of Code Section
18-2-74, within four years after the transfer was made or
the obligation was incurred or, if later, within one year
after the transfer or obligation was or could reasonably
have been discovered by the claimant;

(2) Under paragraph (2) of subsection (a) of Code Section
18-2-74 or subsection (a) of Code Section 18-2-75, within
four years after the transfer was made or the obligation
was incurred; or

(3) Under subsection (b) of Code Section 18-2-75, within
one year after the transfer was made or the obligation was
incurred.

19

repose is absolute; the bar of the statute of limitations is contingent." <u>Trax-Fax, Inc. v. Hobba</u>, 627 S.E.2d 90, 94 (Ga. Ct. App. 2006) (internal quotation and citation omitted).

In <u>Trax-Fax</u>, the Georgia Court of Appeals examined several statutes of repose for "hallmark" language distinguishing them from statutes of limitation. The court listed the following examples from Georgia statutes of repose: "in no event may an action for medical malpractice be brought more than five years after the date on which the negligent or wrongful act or omission occurred" (O.C.G.A. § 9-3-71(b)); "no action to recover damages . . . shall be brought against any person performing . . . construction of such an improvement more than eight years after substantial completion of such improvement" (O.C.G.A. § 9-3-51(a)); and "no action shall be commenced . . . with respect to an injury after ten years from the date of the first sale for use or consumption of the personal property causing . . . the injury" (O.C.G.A. § 51-1-11(b)(2)).  <u>Trax-Fax</u>, 627 S.E. 2d at 94.  Based on the foregoing, the court concluded that O.C.G.A. § 34-9-245, which reads "[n]o claim for reimbursement shall be allowed where the application for reimbursement is filed more than two years from the date such overpayment was made," was properly interpreted as a

20

statute of repose.  Id. at 95.  The court also noted, the fact that a statutory

provision does not label itself as a statute of repose is not dispositive.  Id. at 94.

Ms. Murphy correctly notes that case law on GUFTA's limitations

provision is limited.  In U.S. v. Bacon, 82 F.3d 822 (9th Cir. 1996), the Ninth

Circuit analyzed the "extinguishment provision" under Washington's Uniform

Fraudulent Transfer Act, which is substantively identical to O.C.G.A. § 18-2-

79.  The circuit court found that Washington's UFTA "introduce[d] a claim

extinguishment provision which abolishes the right to bring a fraudulent

transfer action if the action is not brought" within the designated time frame.

Bacon, 82 F.3d at 823.  The court elaborated: "This provision is not merely

remedial or procedural; it seeks to affect substantive rights.  Its purpose is to

make clear that lapse of the statutory periods prescribed by the section bars the

right and not merely the remedy.  It imposes a condition upon the right to bring

an action and therefore introduces a new element of a fraudulent transfer

claim."  Id. at 824 (internal quotations and citations omitted); see also LaRosa

v. LaRosa, 482 Fed. App'x 750 (4th Cir. 2012) (classifying same

extinguishment provision under West Virginia UFTA as statute of repose);

Klein v. Capitol One Fin. Corp., No. 4:10-CV-00629-EJL, 2011 WL 3270438,

at *7-8 (D. Idaho July 29, 2011) (construing same provision in Idaho UFTA as statute of repose not subject to equitable principle of tolling).

Plaintiffs respond that "though the marital residence transfer occurred on March 23, 2007, it should be viewed in conjunction with the other transfers occurring up to and through the time of the filing of the original complaint." (Pl.s' Resp. Br., [310] at 4 of 23.)  Plaintiffs cite no legal authority for their position.  Plaintiffs also do not respond to Marilyn Murphy's argument that § 18-2-79(3) should be interpreted as a statute of repose, which would bar any argument based on tolling or waiver.  Indeed, Plaintiffs do not even argue that tolling or waiver should apply here.  Therefore, the Court agrees with Marilyn Murphy that a one-year statute of repose applies.

Vince Murphy transferred his half interest in the marital residence to Marilyn Murphy on March 23, 2007, and recorded the deed on March 27. Plaintiffs' original Complaint was filed on March 17, 2011.  Seeing no meaningful opposition from Plaintiffs and finding that the transfer occurred well outside of the extinguishment period, the Court agrees that Marilyn Murphy is entitled to summary judgment on Count I to the extent the claim is based on § 18-2-75(b).

2.      *Marilyn Murphy's half of the marital residence*

Next, Ms. Murphy argues that Count I should be dismissed in part because she already owned a half interest in the marital residence, and therefore her portion was not a "transfer" under GUFTA.  GUFTA defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease, and creation of a lien or other encumbrance."  O.C.G.A. § 18-2-71(12).  "'Asset means *property of a debtor*."  O.C.G.A. § 18-2-71(2) (emphasis added).

Plaintiffs do not argue that Marilyn Murphy's half interest in the marital estate falls within the definition of "asset" or "transfer" under GUFTA.  Rather, Plaintiffs respond that Marilyn "puts the cart before the proverbial horse" because the Court could determine that the marital residence transfer was part of a "common scheme or plan to transfer assets" and order that money from the sale of the residence be used to satisfy a judgment in this action.  (Pl.s' Resp. Br., [310] at 7-8 of 23.)  The Court agrees with Marilyn that the "asset" or "transfer" at issue here is Vince's half-interest in the marital residence and Marilyn's half-interest is not a "transfer" subject to review under GUFTA.  See

23

U.S. v. Sherrill, 626 F. Supp. 2d 1267, 1271-76 (M.D. Ga. 2009) (treating the "transfer" as the half-interest in real property conveyed by the debtor to his wife, a joint tenant).  Plaintiffs' and Marilyn's arguments regarding potential remedies in this case are premature; the Court will address those issues at the appropriate time.

3. *Good Faith and Reasonably Equivalent Value*

Next, Marilyn Murphy argues that Counts I and II should be dismissed because she acted in good faith and gave reasonably equivalent value in exchange for the marital asset transfers.  As evidence of her good faith, Ms. Murphy states that she did not know about the Kentucky Litigation until Plaintiffs served her with a post-judgment subpoena in October 2010.  She also states that she was not ever involved in Vince's financial dealings, and she was not aware of any business or financial problems between Plaintiffs and Vince prior to being served with the subpoena.  (Marilyn Murphy MPSJ Br., [295-2] at 9-10 of 27.)  She argues that she had legitimate, good-faith reasons for handling her divorce (and related property division) the way she did, including: to avoid the expense and time associated with complex audits and legal action; Vince's interest in keeping control of his companies and her lack of interest in

the businesses; her preference for holding onto secure investments in the form of blue-chip stocks; to avoid airing the couple's "dirty laundry;" and reluctance to expose her oldest daughters to a second messy divorce.  (Id. at 10-11 of 27.)

Marilyn also claims that she gave reasonably equivalent value for the transfers from Vince.  According to Ms. Murphy, consistent with Vince's financial statements, she received slightly more than half of the marital property in the divorce.  (Id. at 13 of 27.)  She also points to certain "indirect" benefits Vince received in the divorce, such as Marilyn's release of her substantial claim for alimony and saving the expense and intrusiveness (into his personal and professional life) of prolonged litigation.  (Id. at 15-16 of 27.)

In their response, Plaintiffs argue that Marilyn did not act in good faith, but rather participated in a four-year campaign to divest Vince of substantially all of his assets, including those assets he supposedly "kept" in the divorce. (Pl.s' Resp. Br., [310] at 8-9 of 23.)  They note several cash transfers between Marilyn and Vince between 2007 and 2011, and the opening and closing of various bank accounts during that time.  (Id. at 9-10 of 23.)  They also point to a transfer of $25,000 from Marilyn to Vince's new wife, Ms. Talalia, on July 21,

25

2011, and Marilyn's purchase of a new home in June 2010 with funds from a joint account funded by Vince.  (Id. at 10-11 of 23.)

Plaintiffs also contend that Marilyn did not give reasonably equivalent value for the transfers from Vince.  First, they argue, transfers were not made in accordance with the Divorce Decree.  Second, they argue that Vince ultimately transferred substantially all of his assets he "kept" in the divorce to Marilyn.  And third, even though Marilyn purportedly waived her right to alimony, Vince Murphy continued to pay her the same amount on a bi-weekly basis through one of his companies.  (Id. at 12-15 of 23.)

In a prior Order ([335]), the Court denied Plaintiffs' motion for summary judgment on Counts I and II because material factual disputes exist regarding Defendants' intent, whether the marital transfers were made in exchange for reasonably equivalent value, and the solvency or insolvency of Vince at the times the transfers were made.  Those factual disputes remain and are properly reserved for a jury.  Therefore, Marilyn Murphy is not entitled to summary judgment on grounds that she acted in good faith and gave reasonably equivalent value for the transfers.

26

### 4.    Full Faith and Credit Act

Finally, Marilyn Murphy argues that she is entitled to summary judgment on Count I under the Full Faith and Credit Act, 28 U.S.C. § 1738.  She maintains that Plaintiffs are prohibited from collaterally attacking the Divorce Decree, which is an enforceable judgment from a state court of competent jurisdiction.  However, as Plaintiffs note, the Court has already determined that Plaintiffs are not trying to invalidate or otherwise attack the Superior Court's Decree.  (Order, [94] at 12 of 23.)  In fact, Plaintiffs have consistently maintained that the Marriage Settlement Agreement and Divorce Decree were merely "shams" and actual asset transfers were not made in accordance with those documents.  Plaintiffs are seeking damages for the actual transfers, which they allege were fraudulently made to shield Vince Murphy's assets – an action expressly authorized by GUFTA.  Therefore, Marilyn Murphy is not entitled to summary judgment on this basis.

In sum, Marilyn Murphy's motion for partial summary judgment is **GRANTED in part and DENIED in part** with respect to Count I.  To the extent Count I is based on § 18-2-75(b), the claim is time-barred.  Further, Marilyn's half-interest in the marital residence is not a "transfer" subject to

27

review under GUFTA.  Otherwise, factual questions remain regarding Count I

and summary judgment is denied.

      B.      <u>Count II: Marital Asset Transfers</u>

              *1.      Claim under § 18-2-75(b)*

     Vince and Marilyn Murphy's Divorce Decree was entered on January 9,

2008.  Marilyn Murphy advances the same argument she did with respect to the

marital residence transfer – that Plaintiffs' claim is time-barred to the extent it is

based on O.C.G.A. § 18-2-75(b).  Again, Plaintiffs do not oppose Marilyn's

argument that § 18-2-79(3) operates as a statute of repose.  Instead, Plaintiffs

respond that the date of the Divorce Decree did not trigger the running of any

limitations period because Vince and Marilyn did not actually transfer assets

pursuant to the Divorce Decree.  (Pl.s' Resp. Br., [310] at 5-6 of 23.)  In other

words, there is a dispute regarding when the actual transfers were made, if they

were made at all.  Because the transfer date is essential to determining whether

any extinguishment period has run, and because there is a factual dispute as to

the Count II transfer dates, the Court finds that Marilyn Murphy is not entitled

to summary judgment on this basis.

2.      *Good Faith and Reasonably Equivalent Value*

For the reasons set forth in Part II.A.3, <u>supra</u>, the Court finds that material factual disputes preclude summary judgment for Marilyn Murphy on this basis.

3.      *Full Faith and Credit Act*

For the reasons stated above in Part II.A.4, <u>supra</u>, the Court finds Ms. Murphy is not entitled to summary judgment on this basis.  In sum, Marilyn Murphy's motion is **DENIED** with respect to Count II.

<u>C.</u>      <u>Count III: Pre-Divorce Cash Transfers</u>

Marilyn Murphy moves for summary judgment on Count III to the extent Plaintiffs' claims are asserted under §§ 18-2-74(a)(2) and 18-2-75 on grounds that those claims are time-barred under §§ 18-2-79(2) and (3).  The pre-divorce cash transfers at issue in Count III occurred between February 2007 and January 2008, and totaled $868,000.  Marilyn Murphy argues that to the extent § 18-2-79(2) and (3) operate as statutes of repose, Plaintiffs' claims under §§ 18-2-74(a)(2) and 18-2-75 are outside of the respective four-year and one-year extinguishment periods.  Further, she argues, statutes of repose do not allow for

29

relation back by amendment, so the operative filing date under these provisions is March 18, 2013, when the Amended Complaint was filed.

Plaintiffs respond that § 18-2-79 is a statute of limitations, not a statute of repose, because the statute "specifically contains a discovery provision."  (Pl.s' Resp. Br., [310] at 17 of 23.)  Furthermore, Plaintiffs argue, this Court already determined that the claims in the Amended Complaint relate back to the original filing date.  (See Order, [243] at 6 of 10.)  Both of Plaintiffs' arguments ignore the nuances of Marilyn Murphy's position and the GUFTA extinguishment provision.

The Order [243] referenced by Plaintiffs addressed Plaintiffs' motion to amend the Complaint [184].  In their motion to amend, Plaintiffs argued that they could not reasonably have discovered these transactions until September 7, 2012, because of Defendants' obstruction of the discovery process.  The Court agreed with Plaintiffs that Defendants had not been entirely forthcoming during discovery and found "if not for Defendants' actions, Plaintiffs would have discovered said transactions much earlier."  (Order, [243] at 6 of 10.)

Marilyn Murphy raised a statute of limitations argument in her response [187] to Plaintiffs' motion to amend.  In their reply, Plaintiffs only discussed

30

their "*actual fraud claim*" under § 18-2-74(a)(1) and the corresponding

limitations provision, § 18-2-79(1), which contains a "discovery" rule.  (Pl.s'

Reply, [195] at 4-11 of 18 (emphasis added).)  There was no mention by

Plaintiffs of §§ 18-2-79(2) or (3), which do not contain discovery rules, or of

any claims Plaintiffs may have had under §§ 18-2-74(a)(2) or 18-2-75.  (Id.)

Therefore, the Court's prior Order is properly limited to what was then before

it: Plaintiffs' claim under § 18-2-74(a)(1) for actual fraud and the corresponding

limitations provision, § 18-2-79(1).

Marilyn Murphy does not argue that § 18-2-79(1) (with its discovery

rule) operates as a statute of repose, or that relation back of claims is not

permitted under that subsection.  Her argument is limited to subsections (2) and

(3) of § 18-2-79,[8] and she correctly states that amended complaints cannot relate

back "so as to revive a cause of action already extinguished by [a] statute of

repose."  Macfarlan v. Atlanta Gastroenterology Assoc.s, Inc., 732 S.E.2d 292,

---

[8] It is possible to have statutes of limitation and statutes of repose within the same code section.  For example, O.C.G.A. § 9-3-71, which governs limitations periods for medical malpractice claims, contains a statute of limitations in subsection (a) and a statute of repose in subsection (b). This structure is made explicit in subsection (c): "Subsection (a) of this Code section is intended to create a two-year statute of limitations. Subsection (b) of this Code section is intended to create a five-year statute of ultimate repose and abrogation."

31

296 (Ga. Ct. App. 2012).  Accordingly, the Court's prior decision regarding relation back of claims applies to Plaintiffs' actual fraud claim under § 18-2-74(a)(1).  However, to the extent Count III is based on §§ 18-2-74(a)(2) or 18-2-75, the claim is barred by GUFTA's statutes of repose.  Thus, Marilyn Murphy's motion for partial dismissal of this Count is **GRANTED**.

    D.    <u>Count IV: Post-Divorce Cash Transfers</u>

Marilyn Murphy moves for partial summary judgment on the largest transfer included in Count IV ($900,000) because, she argues, she gave reasonably equivalent value to Vince for the transaction.  Marilyn received the $900,000 from Vince on the day their divorce was finalized.  According to Marilyn, at the time she negotiated the Marriage Settlement Agreement with Vince, she believed that she was receiving *all* of the Coca-Cola stock purchased during their marriage, which was recorded in the Agreement as 160,000 shares. However, Marilyn later discovered that there were actually 180,000 shares acquired during the marriage and she "extracted additional money from Vince to rectify this 20,000 share disparity."  (Marilyn Murphy's MPSJ Br., [295-2] at 22 of 27.)  Marilyn argues that Vince received reasonably equivalent value for the transaction because he avoided any action by Marilyn to reform or set aside

the Settlement Agreement, and he fulfilled his moral obligation to Marilyn by replenishing the pool of stock he had drawn down, even though he promised never to do so.  (Id. at 22-23 of 27.)

Plaintiffs respond[9] that Vince was under no obligation to transfer $900,000 to Marilyn so that she could purchase an additional 20,000 shares of Coca-Cola stock, and that he made the transfer for no consideration.  (Pl.s' MPSJ Br., [297-1] at 11-13 of 16.)  Plaintiffs maintain that this transfer was made with actual intent to hinder, delay, or defraud Vince's creditors.  (Id.)  In support of their argument, Plaintiffs note: the transfer was made to an insider; Vince used a cashier's check to conceal the transaction and then falsely stated under oath that 180,000 shares of stock were transferred according to the Marriage Settlement Agreement; at the time of transfer, Vince was aware that the Kentucky litigation had been filed; and this transfer was part of a scheme to transfer substantially all of Vince's assets between 2007 and 2010.  (Id. at 12 of 16.)  Plaintiffs argue, "Defendants have provided no explanation for the transfer of the $900,000." (Id. at 13 of 16.)

_____

[9] In their response, Plaintiffs incorporate by reference their brief in support of partial summary judgment as to this transfer [297-1].

AO 72A
(Rev.8/82)

The Court finds that Marilyn Murphy has not carried her burden to win summary judgment on this Count.  Whether a transfer was made with the intent to defraud creditors "is a question of fact for the jury to decide from all of the circumstances of the case."  Goodman v. Lewis, 277 S.E.2d 908, 910 (Ga. 1981).  Likewise, what constitutes "reasonably equivalent value" is a question of fact for the jury.  Id.  Therefore, Marilyn Murphy's motion is **DENIED** as to this transfer.

> E.      Counts IX and X: Litigation Expenses and Punitive Damages

The Court agrees with Plaintiffs that Marilyn Murphy is not entitled to summary judgment on Counts IX and X.  Whether Plaintiffs are entitled to litigation expenses and punitive damages depends on the mind set and culpability of Defendants, which present questions of fact for a jury.  See Miller v. City Views at Rosa Burney Park GP, LLC, 746 S.E.2d 710, 716 (Ga. Ct. App. 2013) ("Whether the tort was sufficiently aggravating to authorize punitive damages is generally a jury question . . . ."); FitzSimmons v. W.M. Collins Enter.s, Inc., 610 S.E.2d 654, 657 (Ga. Ct. App. 2005) ("Whether punitive damages should be awarded is ordinarily a jury question.  Punitive damages may be awarded where the defendant has engaged in wilful

34

misconduct or fraud, or has acted with malice, wontonness, oppression, or an entire want of care that would raise a presumption of conscious indifference to consequences.") (internal quotations and citations omitted); <u>DJ Mortg., LLC v. Synovus Bank</u>, 750 S.E.2d 797, 400 (Ga. Ct. App. 2013) ("Questions as to whether the defendant has acted in bad faith for the purpose of awarding attorney fees under O.C.G.A. § 16-6-11 are generally for the jury to decide.") (internal quotations and citation omitted); <u>Sherman v. Dickey</u>, 744 S.E.2d 408, 412 (Ga. Ct. App. 2013) ("Our Supreme Court has held that attorney fees cannot be awarded by a trial court pursuant to O.C.G.A. § 16-6-11 at the summary-judgment stage of proceedings because the very language of the statute prevents a trial court from ever determining that a claimant is entitled to attorney fees as a matter of law.") (internal quotations and citation omitted). Therefore, Marilyn Murphy's motion for partial summary judgment is **DENIED** as to Counts IX and X.

To summarize, Marilyn Murphy's Motion for Partial Summary Judgment is: (1) **GRANTED in part and DENIED in part** as to Count I; (2) **DENIED** as to Count II; (3) **GRANTED** as to Count III to the extent the claim is based

35

on §§ 18-2-74(a)(2) or 18-2-75; (4) **DENIED** as to the $900,000 transfer under

Count IV; and (5) **DENIED** with respect to Counts IX and X.

## IV.    Plaintiffs' Motion for Partial Summary Judgment [297]

Plaintiffs move for partial summary judgment on a single transfer from

Vince Murphy to Marilyn Murphy: the $900,000 transfer that occurred on

January 9, 2008.  (See Part II.D., supra.)  Plaintiffs argue that the $900,000

represented nearly all of the cash that Vince Murphy "kept" in the divorce.  As

Plaintiffs note, the Kentucky litigation had already commenced by the time the

transfer was made and under the written terms of the Marriage Settlement

Agreement, Vince was under no obligation to transfer the money to Marilyn.

They also note that the transfer was accomplished by using undisclosed bank

accounts, escrow accounts, and cashier's checks.  All of these facts, they argue,

support a finding that the transfer was made with actual intent to defraud

Vince's creditors.  Again, Marilyn Murphy argues that she acted in good faith

and gave reasonably equivalent value for the transfer.  As the Court already

stated, Plaintiffs' and Marilyn's arguments present questions of fact for a jury.

(See Part II.D, supra.)

AO 72A
(Rev.8/82)

Vince Murphy responds that there are factual disputes as to whether the

$900,000 constituted a gift (rather than correction of a mistake in the Marriage

Settlement Agreement) and whether the transfer rendered him insolvent.  Vince

and Plaintiffs agree that Vince's financial statements show he owned 180,000

shares of Coca-Cola stock before the divorce.  Further, Vince argues, there is

evidence that Marilyn was entitled to all of the stock in the divorce, in exchange

for waiving any claim to alimony and interest in Vince's businesses, and the

$900,000 was in fact used to purchase the 20,000 shares of stock owed to her.

(See Vince Affidavits, [231-1] at 32-33 of 71; [296-1] at 42-43 of 54.)

Vince also argues that Plaintiffs' claim fails because they cannot prove he

was insolvent when the transfer was made.  According to Vince, he did not

know the actual amount of his obligations under the Kentucky guaranty

agreements or the amount of Plaintiffs' Kentucky claims against him until 2009,

and contingent claims cannot be considered in determining insolvency.  He also

notes that under the terms of the Marriage Settlement Agreement, he came out

of the divorce with about $10 million in assets.

Plaintiffs reply that Vince admitted he and his attorney received a letter

from Plaintiffs on October 8, 2007, stating that Vince would be responsible for

at least $6,449,699 under the guaranty agreements.  Furthermore, Vince

estimated his contingent liabilities under the Kentucky Projects at $8,159,979

on his 2006 Financial Statement.  Finally, Plaintiffs contend, Vince's argument

regarding his solvency at the time of the transfer is based on the assets he

allegedly "kept" in the divorce, which, they maintain, he did not in fact keep.

The Court agrees with Vince Murphy that material factual disputes

preclude summary judgment for Plaintiffs on this transfer.  See Goodman v.

Lewis, 277 S.E.2d 908, 910 (Ga. 1981) (whether a transfer was made with

intent to defraud creditors, what constitutes reasonably equivalent value, and

whether a debtor was insolvent present questions of fact for the jury); Gillespie

v. Sand-Rock Transit, Inc., 665 S.E.2d 385, 385 (Ga. Ct. App. 2008) ("It is the

longstanding rule in this state that certain issues of fact, such as insolvency and

intent, are for the jury in actions to set aside a fraudulent transfer . . . .").

Therefore, Plaintiffs' motion for partial summary judgement on the $900,000

post-divorce transfer under Count IV is **DENIED.**

## V.    CMS, MFH, and Vince Murphy's Second Motion for Summary Judgment [296, 339][10]

---

[10] In their Amended Second Motion for Summary Judgment [339], Moving
Defendants incorporate by reference their first brief in support of summary judgment

CMS, MFH, and Vince Murphy ("Moving Defendants") move for summary judgment on all claims in the Amended Complaint.

A.      Counts I & II: Marital Residence and Marital Asset Transfers

Moving Defendants claim that GUFTA does not apply to property division under a valid divorce decree and therefore they are entitled to summary judgment on Counts I & II. (Def.s' MSJ Br., [231-1] at 11-15 of 71.)  Moving Defendants also argue that the transfers made pursuant to the divorce decree were, as a matter of law, "given for 'value', i.e., the satisfaction of Vince's property division and alimony obligations to Marilyn."  (Id. at 15 of 71.) Further, they contend, the divorce did not render Vince Murphy insolvent and there is no evidence that Marilyn Murphy acted with bad faith when the couple divorced.  (Id. at 18-20 of 71.)

Plaintiffs respond that Moving Defendants' arguments are premised on the assumption that the Murphys actually transferred assets pursuant to the Marriage Settlement Agreement and Divorce Decree, which, Plaintiffs have maintained throughout this litigation, they did not.  (Pl.s' Resp. Br., [303] at 4-5

---

[231-1], their Second Motion for Summary Judgment [296], and the Amended Statement of Material Facts [336] filed by Marilyn Murphy.  Moving Defendants also incorporate by reference their first Statement of Material Facts [231-2].

of 26.)  Further, Plaintiffs argue, there is no authority for Moving Defendants'

position that GUFTA does not apply to transfers made under the guise of a

marriage settlement or transfers between spouses or ex-spouses, and nothing in

GUFTA prevents its application to those types of transfers.  (Id. at 6 of 26.)  As

Plaintiffs note, a "transfer" under GUFTA includes "every mode" of parting

with an asset.  Indeed, transfers to "insiders" are among the factors listed in

GUFTA that may show actual intent to defraud creditors.  O.C.G.A. § 18-2-

74(b)(1).

　　　　The Court has already determined that material factual disputes exist with

respect to these transfers; specifically, whether Vince Murphy received

reasonably equivalent value, whether he was rendered insolvent by the

transfers, and whether Defendants intended to defraud Plaintiffs when the actual

transfers were made.  (See Order, [335] at 14-15 of 17.)  The Court finds that

Moving Defendants have not established as a matter of law that they are entitled

to summary judgment on these claims.  Therefore, their motion for summary

judgment is **DENIED** with respect to Counts I and II.[11]

---

[11] The Court notes that Count I has already been dismissed to the extent it is
based on § 18-2-75(b), and Plaintiffs' fraudulent transfer allegations are limited to
Vince's half-interest in the marital residence.  (See Part II.A, supra.)

B.    Count III: Pre-Divorce Cash Transfers

Moving Defendants argue that they are entitled to summary judgment on Count III because the pre-divorce transfers did not constitute "transfers" under GUFTA.  They argue: "Because the pre-divorce asset transfers involved marital property, Vince retained his marital interest in them, even when they were placed in Marilyn's name (and vice-versa).  Therefore, the assets were not 'disposed of', and indeed they were not entirely Vince's to 'do away with.'" (Def.s' MSJ Br., [296-1] at 10 of 54.)

According to the Amended Complaint, these pre-divorce cash transfers totaling nearly $870,000 occurred shortly before the Murphys divorced (one actually occurred after they filed for divorce).  (Am. Compl., [244] ¶ 49.) Plaintiffs also allege that the transfers were not accounted for in the couple's Marriage Settlement Agreement or Divorce Decree.  (Id. ¶ 50.)  Therefore, they allege, the assets were in fact transferred to Marilyn with the intent to defraud Plaintiffs.  (Id. ¶ 51.)

A "transfer" under GUFTA is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release,

41

lease, and creation of a lien or other encumbrance." O.C.G.A. § 18-2-71(12).

Given GUFTA's broad definition of "transfer" and Plaintiffs' allegation that

Vince did ultimately part with the assets soon after he transferred them, the

Court finds that factual issues preclude summary judgment for Moving

Defendants on this Count. The Murphys' intent when the transfers were made

presents a jury question. Therefore, Moving Defendants' motion is **DENIED**

with respect to Count III.[12]

        C.      Count IV: Post-Divorce Transfers

Moving Defendants argue that a number of the transactions listed under

Count IV[13] were not "transfers" under GUFTA because in some instances,

Vince simply transferred assets between his own accounts, in another he

actually received an asset from Marilyn, and other transactions were loans and

the value received was the promise to repay them (which Vince did). (Def.s'

MSJ Br., [296-1] at 11 of 54.) According to Moving Defendants, with respect

---

[12] The Court notes that Count III has already been dismissed to the extent it is based on §§ 18-2-74(a)(2) or 18-2-75. (See Part II.C, supra.)

[13] Paragraph 54 of the Amended Complaint ([244]) lists fourteen dollar amounts and corresponding dates, but does not provide details for each transaction. Vince argues he is entitled to summary judgment as to items 5, 6, 7, 12, 13, and 14.

to these transactions, "all the funds remained with, or were returned to, Vince, and consequently there is nothing to set aside." (Id. at 11 of 54.)  As for the remaining transactions under Count IV, Moving Defendants contend that Vince received reasonably equivalent value for them and they did not render Vince insolvent.

With respect to Moving Defendants' argument that some of the transactions under Count IV were loans, Plaintiffs point out that there is no evidence of documents, banking or otherwise, to show the existence or repayment of those "loans."  (Pl.s' Resp. Br., [303] at 7 of 26.)  Furthermore, they argue, Vince had an obligation under the Kentucky Project guaranty agreements to disclose to Plaintiffs any material change in his financial condition.  Instead of doing that, Plaintiffs argue, Vince moved and concealed assets up to and during this litigation and ultimately transferred substantially all of his assets to Marilyn (despite his continuing assertion that he kept some of these assets).  (Id. at 8-10 of 26.)  Finally, Plaintiffs argue, receipt of reasonably equivalent value is not a defense under § 18-2-74(a)(1) where there is actual intent to defraud a creditor.  (Id. at 10 of 26.)

AO 72A
(Rev.8/82)

As the Court has already stated, whether Vince received reasonably equivalent value for these transfers is a question of fact.  Likewise, Plaintiffs remaining arguments – that Vince was rendered insolvent by the post-divorce transfers, that Marilyn acted in bad faith, that the Murphys were not acting in the normal course of their financial affairs, and that Vince acted with intent to defraud Plaintiffs – raise questions for a jury.  Therefore, Moving Defendants' Second Motion for Summary Judgement is **DENIED** as to Count IV.

> D.    Counts V and VI: Carroll Loan and CMS Asset Transfers

With respect to the Carroll Loan and CMS Asset transfers, Moving Defendants argue that because Patrick Carroll and ARM have been dismissed from the lawsuit, there is no remaining party from whom Plaintiffs can obtain relief under O.C.G.A. § 18-2-77(a).  (Def.s' MSJ Br., [231-1] at 21 of 71.) They also argue that the transfers were supported by reasonably equivalent value.  (Id.)  Plaintiffs counter that, should they obtain a judgment against Vince Murphy, the Court may levy execution on the asset transferred or its proceeds, regardless of whether Mr. Carroll or ARM are Parties to the suit. (Pl.s' Resp. Br., [303] at 20 of 26.)

44

The Court agrees with Plaintiffs that Moving Defendants are not entitled to summary judgment on this Count.  If Plaintiffs obtain a judgment against Defendants, various forms of relief may be available to Plaintiffs against Vince, as the debtor, as well as against the transferees and the transferred assets.  See generally, O.C.G.A. § 18-2-77.  Whether reasonably equivalent value was exchanged for these transfers is a factual issue.  Therefore, Moving Defendants' motion is **DENIED** with respect to these Counts.

    E.    Counts VII: Gazebo Park Apartment Complex Transfer

Moving Defendants do not address this Count in their argument. However, in their factual background, they state that Vince sold the Gazebo Park Apartments in early 2007 to a family owned partnership in order to achieve maximum tax and financing benefits.  (Def.s' MSJ Br., [231-1] at 4 of 71.)  Plaintiffs have not responded to these points, but the Court has already determined that material factual questions remain as to whether Vince received reasonably equivalent value for this transfer.  (See Order, [335] at 15-16 of 17.) Accordingly, summary judgment is **DENIED** as to Count VII.

45

F.    Count VIII: Civil Conspiracy

Finally, the Parties agree that Plaintiffs' civil conspiracy claim rises or falls with Plaintiffs' GUFTA claims.  Therefore, to the extent GUFTA claims remain in this action, summary judgment is **DENIED** as to Count VIII.

### Conclusion

Based on the foregoing, Marilyn Murphy's Motion for Partial Summary Judgment [295] is **GRANTED in part and DENIED in part**; Plaintiffs' Motion for Partial Summary Judgment [297] is **DENIED**; and Community Management Services, Inc., Multifamily Housing Developers, LLC, and Vince Murphy's Second Motion for Summary Judgment [296, 339] is **DENIED**.

The Parties are **ORDERED** to file a proposed consolidated pretrial order within 30 days of the entry of this Order. Counsel are reminded of the Court's admonition in the October 25, 2013 Order [300] to attempt in good faith to reach a stipulation as to the authenticity of all bank records and other relevant documents that may be tendered at the trial of the case. Counsel should also explore other stipulations that may facilitate the efficient trial of the case as the Court will impose time limits on the presentation of evidence at trial.

AO 72A
(Rev.8/82)

**SO ORDERED**, this <u>11th</u> day of August, 2014.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)