[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14634
_____

D.C. Docket No. 1:11-cv-00832-RWS


ALLIANT TAX CREDIT 31, INC,
a Florida corporation,
ALLIANT TAX CREDIT FUND XXVII, LTD.,
a Florida limited partnership,
ALLIANT TAX CREDIT TAX CREDIT XXVII, INC,
a Florida corporation,
ALLIANT TAX CREDIT XI, INC.,
a Florida corporation,
ALLIANT TAX CREDIT XI, LTD.,
a Florida limited partnership,

                              Plaintiffs - Counter Defendants – Appellees -
                              Cross Appellants,

                    versus

M. VINCENT MURPHY, III,
MULTIFAMILY HOUSING DEVELOPERS, L.L.C.,
a Georgia limited liability company,
COMMUNITY MANAGEMENT SERVICES, INC.,
a Georgia corporation,
GAZEBO PARK APARTMENTS OF ACWORTH, LLC,
a Georgia limited liability company,

Defendants - Appellants - Cross Appellees,

MARILYN MURPHY,

Defendant - Counter Claimant - Appellant - Cross Appellee.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(May 15, 2019)

Before TJOFLAT and WILLIAM PRYOR, Circuit Judges, and MURPHY,[*] District Judge.

TJOFLAT, Circuit Judge:

This fraudulent-transfer case, like many such cases, is a suit about a suit.  In the first suit, Plaintiffs obtained a judgment in federal district court in Kentucky for breach of a partnership contract.  But when Plaintiffs tried to collect, they discovered that the once-wealthy Defendant was figuratively penniless.  The surprised Plaintiffs surmised that Defendant had colluded with his former wife to fraudulently transfer his assets to her (or to entities under her control) as part of their divorce settlement.  So Plaintiffs sued—again—this time in federal district court in Georgia—to recover their judgment under Georgia's fraudulent-transfer

---

[*] Honorable Stephen J. Murphy, III, United States District Court for the Eastern District of Michigan, sitting by designation.

statute.  Agreeing with Plaintiffs that fraudulent transfers had occurred, a jury

returned a verdict in their favor.  The District Court entered judgment accordingly,

and this appeal and cross-appeal followed.

## I.

## A.

## 1.

The run-up to this suit began when Plaintiffs, five entities that we

collectively refer to as "Alliant,"[1] lent Defendant M. Vincent Murphy, III

investment capital to build low-income housing units that were never completed.

So Alliant sued him and other guarantors of the debt in federal court in the Eastern

District of Kentucky for breach of their partnership contract.  Alliant was joined in

that suit by Alliant Tax Credit Fund 31-A, Ltd. ("Alliant 31-A"), which also lent

investment capital to Vincent.[2]  Alliant and Alliant 31-A prevailed, and the District

Court for the Eastern District of Kentucky entered a judgment (the "Kentucky

judgment") in their favor for $8,946,643.  Vincent appealed, and the Court of

---

[1] The full names are Alliant Tax Credit 31, L.L.C. ("Alliant 31"), Alliant Tax Credit Fund XXVII, Ltd. ("Alliant XXVII, Ltd."), Alliant Tax Credit Fund XXVII, L.L.C. ("Alliant XXVII, L.L.C."), Alliant Tax Credit XI, L.L.C. ("Alliant XI, L.L.C."), and Alliant Tax Credit XI, Ltd. ("Alliant XI, Ltd.").

[2] Alliant 31-A was dismissed by the District Court for the Northern District of Georgia because its presence would have destroyed subject-matter jurisdiction.  For this reason (and others that will become clear), we treat Alliant 31-A separately.

Appeals for the Sixth Circuit affirmed. *Alliant Tax Credit Fund 31-A, Ltd. v. Murphy*, 494 F. App'x 561, 563 (6th Cir. 2012).

But the fraudulent activity that gave rise to this suit began before the Kentucky judgment was entered.

Vincent and his wife, Marilyn Murphy, had earlier divorced in the Superior Court of Fulton County, Georgia.  The divorce decree incorporated a settlement agreement between them.  As part of the agreement, Marilyn received from Vincent several millions of dollars in cash and commercial paper, stock shares, a mountain cabin, household furnishings, and an apartment complex.  These assets are the basis for the fraudulent-transfer action here.  When Alliant sought to collect on the Kentucky judgment, it found that Vincent was judgment proof.  So it sued Vincent for a second time.

Alliant (but not Alliant 31-A) brought this action against Vincent, Marilyn, Multifamily Housing Developers, L.L.C. ("Multifamily Housing"), and Community Management Services, Inc. ("CMS"),[3] in the District Court for the Northern District of Georgia under the Uniform Fraudulent Transfers Act (the "UFTA"), O.C.G.A. §§ 18-2-70 to 80 (2010), *amended by* the Uniform Voidable

---

[3] Alliant alleged that Multifamily Housing and CMS, both of which Marilyn controlled, were also fraudulent transferees of some of Vincent's assets.

Transactions Act (the "UVTA"), O.C.G.A. §§ 18-2-70 to 85 (2015).[4]  The UFTA, a quintessential fraudulent-transfer statute, allows creditors to void certain asset transfers made by a debtor with the purpose of immunizing itself from collection. *See* O.C.G.A. § 18-2-77 (2010).  Alliant claimed that the Murphys' divorce settlement and Vincent's asset transfers to Defendants were ruses to evade Vincent's creditors and thus sought to void those transfers.  The case proceeded to trial, and a jury returned an itemized verdict for Alliant after having found that twenty-three transfers from Vincent to Defendants were fraudulent.  The jury also found that the Murphys were subject to punitive damages but that only Vincent had acted with the "specific intent to cause harm."  It awarded $1,000,000 in punitive damages against him and $100,000 in punitive damages against Marilyn.

2.

After the jury returned its verdict, the District Court for the Northern District of Georgia entered a final judgment (the "Georgia judgment") for Alliant.  Before describing what the judgment provided, we pause momentarily to note the remedies available under the UFTA.

---

[4] Georgia's General Assembly amended the UFTA in 2015.  *See* Uniform Voidable Transactions Act, 2015 Ga. Laws 1019 (codified at O.C.G.A. §§ 18-2-70 to 85 (2018)).  As part of the amendment, the General Assembly changed the name of the statute.  Some of the amendments are consequential to issues we must decide on appeal.  But the parties agree—and we follow their lead—the UFTA is the version of the law we must apply.  We discuss the UVTA—note the "V" in place of the "F"—at various points throughout this opinion; we make clear when we reference that currently enacted version of the statute.

The UFTA provides creditors with both equitable and legal remedies. The creditor may obtain, as an equitable remedy, "[a]voidance of the transfer . . . to the extent necessary to satisfy the creditor's claim." *See id.* § 18-2-77(a)(1). Or it may obtain, as a legal remedy, "judgment [against the transferee] for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less." *See id.* § 18-2-78(b).

Alliant did not seek avoidance of any of the transfers made. Nor realistically could it: Most of Vincent's transfers were in the form of cash that has since been turned into proceeds that are likely untraceable. Rather, it sought a money judgment for the *value* of the assets transferred. Said differently, it sought the legal remedy available under the UFTA.

The Georgia judgment, which purported to implement the jury's verdict, provided that Alliant would receive the sum of $10,137,285.84, which consisted of the amount of the Kentucky judgment ($8,946,643), interest on that judgment ($90,642.84), and the punitive-damages awards against Vincent and Marilyn ($1,000,000 and $100,000, respectively). The District Court for the Northern District of Georgia also issued a writ of execution that directed the U.S. Marshal to seize Defendants' assets to satisfy the judgment.[5]

---

[5] In ordering the U.S. Marshal to seize the items identified in the judgment, the District Court appeared to be entering an *in rem* judgment, as if Alliant had brought suit against the fraudulently conveyed assets or their proceeds themselves. The Court should have entered an *in*

3.

Following the entry of the Georgia judgment, Marilyn satisfied the judgment in full, and Alliant moved to alter or amend the judgment, *see* Fed. R. Civ. P. 60, to allow prejudgment interest under Georgia law.  The District Court for the Northern District of Georgia denied this motion, reasoning that (1) Alliant's UFTA claim was unliquidated—that is, not reduced to a fixed sum—until the Georgia judgment was entered and (2) under Georgia law, entitlement to prejudgment interest for unliquidated claims requires compliance with the Unliquidated Damages Interest Act, O.C.G.A. § 51-12-14 (2018), whose procedures Alliant had not followed.  Defendants appealed the judgment entered pursuant to the verdict, and Alliant cross-appealed the order denying prejudgment interest.

B.

This appeal and cross-appeal require us to decide numerous discrete issues.  We first take up justiciability problems in Part II.  We then turn to the merits, addressing Defendants' arguments on appeal in Parts III through V and Alliant's arguments on cross-appeal in Part VI.  We conclude in Part VII.

II.

---

*personam* judgment against Vincent and Marilyn individually and issued writs of execution against their assets or writs of garnishment against their accounts.  This error does not matter for our purposes, however, because the parties treated the judgment as though it were entered *in personam*.

We begin by addressing two jurisdictional bars to the District Court's power to entertain this suit: mootness and subject-matter jurisdiction.[6]  We then address non-jurisdictional bars.  Defendants challenge the Court's decision not to abstain from exercising its jurisdiction on three prudential grounds.  First, that even if the parties are diverse of citizenship, this case falls within the domestic-relations exception to diversity jurisdiction.  Second, that by entertaining this suit, the Court violated the *Rooker-Feldman* doctrine.[7]  And third, that Alliant is collaterally estopped from attacking the transfers as fraudulent.

A.

The first question, given Marilyn's full satisfaction of the Georgia judgment: Are this appeal and cross-appeal moot?  After oral argument, we asked the parties to brief this question and having reviewed their responses, we are satisfied that the case remains a case or controversy within the meaning of Article III.  *See* U.S. Const. art. III, § 2, cl. 1.

"What matters [for mootness] is whether the parties' actions objectively manifest an intent to abandon the issues on appeal."  *RES-GA Cobblestone, LLC v. Blake Constr. & Dev., LLC*, 718 F.3d 1308, 1315 (11th Cir. 2013).  So payment

---

[6] Unless otherwise stated, our use of "District Court" from this point forward refers to the Court below—the District Court for the Northern District of Georgia.

[7] *Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 44 S. Ct. 149 (1923), and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 103 S. Ct. 1303 (1983).

moots an appeal "only if the parties mutually intended a final settlement of all the claims in dispute and a termination of the litigation." *McGowan v. King, Inc.*, 616 F.2d 745, 747 (5th Cir. 1980) (per curiam).[8]

This case continues to breathe life. In *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 518 F.3d 1302 (11th Cir. 2008), we applied the Supreme Court's decision in *United States v. Hougham*, 364 U.S. 310, 81 S. Ct. 13 (1960), and held that an appeal and cross-appeal situated much like the ones before us today were not moot. There, the plaintiff's counsel signed satisfaction-of-judgment documents that were subsequently filed in the district court, but the plaintiff did not expressly reserve his right to appeal. 518 F.3d at 1305. But there, as here, the parties "continued to pursue their appeals." *Id.* at 1307. There, as here, the parties "filed supplemental letter briefs addressing the merits." *Id.* And there, as here, a party "inform[ed] us of a change in status involving one of the defendants." *Id.* In other words, "[i]nstead of filing a motion to dismiss the appeal as soon as a satisfaction was filed in the district court, both parties continued to litigate the case in this Court as though nothing had changed." *Id.* at 1308.

In fact, Marilyn merely did the effective equivalent of posting a supersedeas bond—an act that by itself does not moot a case. *See* Fed. R. Civ. P. 62(b).

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

When a judgment is appealed, both the winning and losing parties face risk in the period between the time judgment is entered and the time it is affirmed or reversed.  The winning party seeks immediate satisfaction of the judgment because assets available at the time judgment is entered might disappear by the time it is affirmed.  And the losing party seeks delayed satisfaction of judgment for a parallel reason: Assets available at the time judgment is entered might disappear by the time it is reversed.  A supersedeas bond insures both parties against these respective risks.  It permits a judgment debtor to "avoid the risk of satisfying the judgment only to find that restitution is impossible after reversal on appeal" and "secures the prevailing party against any loss sustained as a result of being forced to forgo execution on a judgment during the course of an ineffectual appeal." *Poplar Grove Planting & Ref. Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979).

But posting a supersedeas bond does not moot an appeal.  *See Dale M. ex rel. Alice M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist. No. 307*, 237 F.3d 813, 815 (7th Cir. 2001) (Posner, J.) ("A judgment creditor who pays the judgment pending appeal instead of posting a supersedeas bond (which would automatically stay collection) is entitled to the return of its money if the decision is reversed, and so the payment does not moot the appeal unless the appellant has relinquished his right to seek repayment if he wins." (citation omitted)).

Marilyn's choice to pay the judgment does not render this case moot any more than would her decision to post a supersedeas bond; she simply waived the protection a bond would provide.  *Cf.* 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2905, at 724−25 (3d ed. 2012) ("[A] person who cannot furnish a supersedeas bond does not lose the right to appeal, although he does assume the risk of getting his money back again if the judgment is reversed.").

In short, the "objective manifestations of both parties clearly indicate that they intended to pursue their positions in the appeal and cross-appeal." *Alvarez Perez*, 518 F.3d at 1308.  We turn now to subject-matter jurisdiction.

### B.

Defendants maintain that the District Court lacked jurisdiction to entertain the dispute because the parties were not diverse of citizenship.

The District Court's subject-matter jurisdiction has continued to present difficulties in this case.  Defendants appealed the Georgia judgment, and two months later, this Court *sua sponte* asked the parties to address subject-matter jurisdiction because diversity jurisdiction was not evident from the pleadings.  In response, Alliant moved to amend its complaint to simply allege the citizenships of all relevant entities.  Defendants, in turn, moved to remand the case to the District Court for a factual determination of subject-matter jurisdiction in the first instance.  After reviewing the parties' responses and motions, we remanded the case to the

District Court so that it might "fully resolve the question of the court's subject-matter jurisdiction over this action." *Alliant Tax Credit Fund 31-A, Ltd. v. Murphy*, No. 15-14634-GG, slip op. at 1 (11th Cir. Apr. 10, 2017) (per curiam).

On remand, Alliant filed a memorandum on Plaintiffs' citizenships. Plaintiffs are a mixture of limited-liability companies and limited partnerships.[9] Some of Plaintiffs' members and partners are natural persons, but some are other limited-liability companies, other partnerships, corporations, banks, and trusts. Alliant traced these entities' citizenships, too. It included with its memorandum to the District Court affidavits, declarations, and authenticated documents. Defendants responded that Alliant's submissions were insufficient to confirm that all relevant entities were accounted for, as well as to confirm those entities' citizenships. The Court observed that though Alliant had initially claimed that the sole citizenship of all five Plaintiffs was Florida, Alliant conceded in its memorandum that Plaintiffs were also citizens of California, Delaware, the District of Columbia, Illinois, Nebraska, New York, Ohio, and Texas. So the Court required further documentary evidence of citizenship. For natural persons, it asked for drivers licenses; for corporations, it asked for annual reports and articles of incorporation or governance documents; for limited partnerships and limited-

---

[9] Alliant 31, L.L.C., Alliant XXVII, L.L.C., and Alliant XI, L.L.C. are limited-liability companies. Alliant XXVII, Ltd. and Alliant XI, Ltd. are limited partnerships.

liability companies, it asked for agreements; for banks, it asked for articles of association; and for trusts, it asked for organizational documents.

After this jurisdictional discovery was complete, the District Court set out its findings as to the parties' citizenships:

Plaintiffs

- Alliant 31 was a citizen of Florida, California, and Illinois.

- Alliant XXVII, Ltd. was a citizen of Florida, California, Illinois, and the District of Columbia.

- Alliant XXVII, L.L.C. was a citizen of Florida, California, and Illinois.

- Alliant XI, L.L.C. was a citizen of Florida, California, and Illinois.

- Alliant XI, Ltd. was a citizen of Florida, California, Illinois, Delaware, New York, Texas, Nevada, and Ohio.

Defendants

- Vincent was a citizen of Georgia.

- CMS was a citizen of Georgia.

- Multifamily Housing was a citizen of Georgia.

- Marilyn was a citizen of Georgia.

As such, it concluded that Alliant had established subject-matter jurisdiction by a preponderance of the evidence.

Defendants, still unsatisfied that diversity jurisdiction was present, moved this Court for leave to file supplemental briefing on the District Court's factual

findings, its failure to sustain evidentiary objections, its admission into evidence of unreliable documents, and its failure to allow adversarial discovery.  We granted Defendants' motion, *Alliant Tax Credit Fund 31-A, Ltd. v. Murphy*, No. 15-14634-GG, slip op. at 2 (11th Cir. Nov. 9, 2017) (single-judge order), and now address these jurisdictional issues.

1.

First, Defendants argue that the record contains insufficient evidence to support the District Court's findings on the citizenships of two inter vivos trusts, whose names we have redacted.[10]  They contend that the trusts' citizenships derive from their beneficiaries and that Alliant has not fully accounted for those beneficiaries.

Whether subject-matter jurisdiction exists presents a mixed question of law and fact.  We review *de novo* a district court's legal conclusions.  *Calderon v. Baker Concrete Constr., Inc.*, 771 F.3d 807, 810 (11th Cir. 2014).  But we review for clear error "any factual determinations necessary to establish jurisdiction," *Dudley v. Eli Lilly & Co.*, 778 F.3d 909, 911 (11th Cir. 2014), including "findings regarding domicile," *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002) (per curiam).  The party invoking federal jurisdiction "must prove, by a

---

[10] These trusts are members of a limited-liability company that is a member of another limited-liability company that is a partner of a limited partnership that in turn is a member or partner of each of the five Plaintiffs in this case.

14

preponderance of the evidence, facts supporting the exercise of jurisdiction."

*Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1363–64 (11th Cir. 2018).

A "traditional trust" holds the citizenship of its *trustee*, not of its

beneficiaries. *See Americold Realty Tr. v. Conagra Foods, Inc.*, 136 S. Ct. 1012,

1016 (2016); *see also Raymond Loubier Irrevocable Tr. v. Loubier*, 858 F.3d 719,

730 (2d Cir. 2017) ("[F]or . . . traditional trusts, it is the citizenship of the trustees

holding the legal right to sue on behalf of the trusts, not that of beneficiaries, that is

relevant to jurisdiction."). A "traditional trust . . . generally describes a fiduciary

relationship regarding property where the trust cannot sue and be sued as an entity

under state law." *Wang ex rel. Wong v. New Mighty U.S. Tr.*, 843 F.3d 487, 495

(D.C. Cir. 2016). So whether a trust is "traditional" requires us to refer to the "law

of the state where the trust is formed." *Id.*; *see also, e.g.*, *id.* (holding that under

District of Columbia law, a trust lacked separate "juridical person status" and thus

could not "sue and be sued as an entity"); *Loubier*, 858 F.3d at 731 (holding that

under Florida law, a trust was not a "distinct juridical entit[y]" and thus was

"incapable of being haled into court except through [its] trustee[]").

The two trusts here were formed in Wisconsin, and under Wisconsin law, a

trust is represented in litigation through its trustee. *See* Wis. Stat. § 701.0106

(stating that the trust code incorporates the "common law of trusts"). Because the

code does not confer "juridical person status" on a trust itself, *see New Mighty U.S.*

15

*Tr.*, 843 F.3d at 495, the trusts are traditional trusts whose citizenships are those of their trustees.  The trustee of both trusts is a natural person who is domiciled in Florida.  As such, she is a Florida citizen.  *See McCormick*, 293 F.3d at 1257.

In short, Alliant has proven diversity jurisdiction by a preponderance of the evidence because if the trustee is diverse of Defendants, the trusts themselves are too.

## 2.

Second, Defendants argue that the District Court erred by admitting the sworn affidavits of three persons who held leadership positions with various members or partners of the five Plaintiffs.  We review a district court's admission of evidence for abuse of discretion.  *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1316 (11th Cir. 2011).

Defendants argue that the affidavits lack foundation, *see* Fed. R. Evid. 602, because the affiants failed to state that only they could change the memberships of their respective entities.  But the relevant question for foundation purposes is whether the affiants had "personal knowledge" of the matter sworn to.  *See id.* Each person laid a foundation for his respective affidavit by stating his position with the relevant entity and that he had access to that entity's records.  As leaders, rather than as minor functionaries, they were well within their wheelhouses to

swear to the entities' compositions. Defendants' argument goes to the weight of the evidence, not to its admissibility.

In short, the District Court was well within its discretion to admit the affidavits.

3.

Third, Defendants challenge the operating agreements for Alliant XXVII, L.L.C. and Alliant XI, L.L.C. on which one affiant relies. They point to missing or wholly redacted pages and font inconsistencies among the pages. As such, they argue that the documents were inadmissible because they could not be authenticated, *see* Fed. R. Evid. 901, and because they were hearsay that did not comport with the business-records exception, *see* Fed. R. Evid. 803(6).

We need not reach these issues because even in a record devoid of this evidence, the District Court's factual findings on these entities' citizenships was not clearly erroneous. For both entities, Alliant submitted the later-issued certificates of conversion from corporations to limited-liability companies. Those documents indicate that both Alliant XXVII, L.L.C. and Alliant XI, L.L.C. have only one member and one general partner. So Defendants' theory that other entities lurk in those entities' structures is unfounded.

4.

17

Fourth, Defendants argue that the District Court should have permitted them to obtain through additional jurisdictional discovery (1) the documentary evidence that Alliant filed in *Alliant Tax Credit Fund XVI, Ltd. v. Thomasville Community Housing, LLC*, 713 F. App'x 821 (11th Cir. 2017) (per curiam),[11] and (2) a copy of the partnership agreement between Alliant 31 and Alliant 31-A.[12]  We review a district court's denial of jurisdictional discovery for abuse of discretion. *Culverhouse v. Paulson & Co.*, 813 F.3d 991, 993 (11th Cir. 2016).

Defendants' underlying grievance is that Alliant cannot be trusted because it has misrepresented its citizenship in other litigation, including litigation in this circuit.  And because one district judge in this circuit required certain documents of Alliant, the District Judge in this (unrelated) case should have too.

To be sure, parties have a "'qualified right to jurisdictional discovery,' meaning that a district court abuses its discretion if it completely denies a party jurisdictional discovery." *Am. Civil Liberties Union of Fla., Inc. v. City of*

---

[11] Alliant XI, L.L.C., a Plaintiff here, was also a party to that case.

[12] We deal with this second request later.  Defendants argue that the record contains insufficient evidence that Alliant 31 meets the amount-in-controversy requirement. *See* 28 U.S.C. § 1332(a) (requiring that a controversy "exceed[] the sum or value of $75,000, exclusive of interest and costs").  Alliant 31 and Alliant 31-A were awarded $1,478,489 via the Kentucky judgment.  Defendants claim that each has partial ownership in that amount and that Alliant 31 has not proven that its own interest is at least $75,000.  We explain later on, however, that Alliant 31 was entitled to sue for the full amount because it was a joint−judgment creditor. *See infra* p. 25.  As such, the amount-in-controversy requirement is met.

*Sarasota*, 859 F.3d 1337, 1341 (11th Cir. 2017) (citations omitted) (quoting *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 729 n.7 (11th Cir. 1982)).

The District Court here did not abuse its discretion.  It did not "completely deny" Defendants jurisdictional discovery.  To the contrary, it ordered Alliant to produce additional documentary evidence after we remanded the case.  Moreover, just because one judge permitted a discovery request does not mean another judge was obligated to do so.  Defendants overlook a basic principle of appellate review: Two district judges can reach two different determinations of what discovery to permit, and under abuse-of-discretion review, we are required to affirm both decisions unless one judge has "made a clear error of judgment" or "applied the wrong legal standard."  *See Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1307 (11th Cir. 2011) (quoting *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1325 (11th Cir. 2005)); *see also id.* at 1306−07 ("Discretion means the district court has a 'range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" (quoting *Betty K Agencies, Ltd. v. M/V Monada*, 432 F.3d 1333, 1337 (11th Cir. 2005))).  In other words, one district judge is not required to follow his brethren in lockstep on discovery matters, just as he is not required to follow him in lockstep on any other decision.  *See United States v. Cerceda*, 172 F.3d 806, 812 n.6 (11th Cir. 1999) (en banc) (per curiam)

("The opinion of a district court carries no precedential weight, even within the same district."). So we do not evaluate this Judge's decision in light of another's decision.

In short, nothing about the District Court's finding of subject-matter jurisdiction, procedurally or substantively, permits reversal. The Court's factfinding was not clearly erroneous. Its evidentiary conclusions were not legally incorrect. And its decision not to entertain additional discovery was not an abuse of discretion.

That's it for the jurisdictional wrinkles, but Defendants offer three other reasons for why the District Court should have evaded the merits.

## C.

Defendants maintain that the District Court was required to abstain under the domestic-relations exception to diversity jurisdiction. We review for abuse of a discretion a district court's abstention decision under the domestic-relations exception. *Stone v. Wall*, 135 F.3d 1438, 1441 (11th Cir. 1998) (per curiam), *certified question answered*, 734 So. 2d 1038 (Fla. 1999).[13]

"The federal judiciary has traditionally abstained from deciding cases concerning domestic relations." *Ingram v. Hayes*, 866 F.2d 368, 369 (11th Cir.

---

[13] Though *Stone* involved a decision to abstain, we see no reason to differently review a decision *not* to abstain.

1988) (per curiam).  The doctrine imposes two limits on our power.  First, we may not "issue divorce, alimony, and child custody decrees."  *Stone*, 135 F.3d at 1440 (quoting *Ankenbrandt v. Richards*, 504 U.S. 689, 703, 112 S. Ct. 2206, 2215 (1992)).  Second, "even when subject-matter jurisdiction might be proper," we abstain from exercising jurisdiction when "sufficient grounds" exist.  *Id.*

Here, the District Court did not issue a divorce, alimony, or child-custody decree.  And Defendants do not cite—and our research does not reveal—a single case when this Court has held that abstention was appropriate when a party to the federal-court proceeding was not a party to the state-court proceeding.  *Cf., e.g.*, *id.* at 1441 ("The exception enunciated in *Ingram* is to be read narrowly and does not—at least, ordinarily—include third parties in its scope.").  In *Stone*, for example, we held that abstention was inappropriate when a father and his daughter sued the father's ex-sister- and ex-mother-in-law for tortious interference of his custodial rights.  *Id.*  Those defendants were not parties to the state-court proceeding and "had no legal claim of custody whatsoever."  *Id.*  Alliant was not a party to the divorce proceedings in the Georgia Superior Court and like the *Stone* plaintiffs, did nothing more than "charge[] Defendants with a tort."  *See id.* at 1440.

In short, the District Court did not abuse its discretion in exercising diversity jurisdiction.  *Cf. Kirby v. Mellenger*, 830 F.2d 176, 179 (11th Cir. 1987) (per

curiam) ("The less a case is a 'core' domestic relations case, e.g., one for a divorce or a simple child custody dispute, the less discretion the district court has to refuse to exercise its jurisdiction.").

D.

Defendants argue that Alliant is collaterally estopped from proving that Marilyn did not give "reasonably equivalent value" for the transfers, which is an element of a UFTA claim. *See* O.C.G.A. § 18-2-74(a)(2) (2010). In adjudicating the Murphys' divorce, the Georgia Superior Court was required to ensure that the distribution of property between them was "equitable." *See Payson v. Payson*, 552 S.E.2d 839, 841 (Ga. 2001); *see also* O.C.G.A. § 19-5-13 (2018). Defendants insist that Alliant cannot now challenge the transfers as fraudulent under the UFTA because the Superior Court already decided that issue in their favor.

Under the full-faith-and-credit statute, *see* 28 U.S.C. § 1738, a district court must afford "preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered." *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1181 (11th Cir. 2017) (en banc) (quoting *Kahn v. Smith Barney Shearson Inc.*, 115 F.3d 930, 933 (11th Cir. 1997)), *cert. denied*, 138 S. Ct. 646 (2018). So we look to the preclusive effect that Georgia law would give the divorce decree. Under Georgia law, issue preclusion, or collateral

estoppel by another name, requires "identity of the parties or their privies."

*Waldroup v. Greene Cty. Hosp. Auth.*, 463 S.E.2d 5, 7 (Ga. 1995) (per curiam).

Nothing about the divorce decree precludes Alliant from challenging the

adequacy of value that Marilyn gave for the transfers because it was not a party to

the divorce proceeding.  And neither Vincent nor Marilyn represented Alliant's

interests when they fraudulently transferred assets between themselves to

immunize Vincent from collection.  *Cf. Smith v. Wood*, 154 S.E.2d 646, 649–50

(Ga. Ct. App. 1967) ("Privity connotes those who are in law so connected with a

party to the judgment as to have such an *identity of interest* that the party to the

judgment represented the same legal right . . . ." (emphasis added) (quoting *Hixson*

*v. Kansas City*, 239 S.W.2d 341, 344 (Mo. 1951) (en banc))).

E.

Defendants relatedly argue that the District Court was required to abstain

because Alliant's suit is a collateral attack on a provision of the divorce decree—

namely the Georgia Superior Court's determination that the distribution of

property was fair to the parties.  Defendants' argument, though unartfully

articulated, is that the *Rooker-Feldman* doctrine applies.  *Rooker-Feldman* bars a

"party losing in state court . . . from seeking what in substance would be appellate

review of the state judgment in a United States district court, based on the losing

party's claim that the state judgment itself violates the loser's federal rights."

23

*Johnson v. De Grandy*, 512 U.S. 997, 1005–06, 114 S. Ct. 2647, 2654 (1994).  But Alliant was not a party to the divorce proceeding, so *Rooker-Feldman* has no application here.  *See id.* at 1006, 114 S. Ct. at 2654 (holding that *Rooker-Feldman* was inapplicable when a party in federal court was "not a party in the state court" because it was in "no position" to seek review of the state court's judgment and thus "[did] not directly attack[] it in [the federal] proceeding").[14]

Having found that the District Court was permitted to entertain this suit, we now turn to the first merits question: whether the Court awarded one Plaintiff, Alliant 31, relief to which it was not entitled.

## III.

Defendants argue that $1,478,489 of the Georgia judgment against it was improper because Alliant 31 was not allowed to collect any of that amount without joining Alliant 31-A as a co-plaintiff.  As explained, Alliant 31-A was dismissed earlier in the litigation.  *See supra* note 2.  By way of background, the Kentucky judgment was for $8,946,643 overall.  As part of that overall total, however, the District Court for the Eastern District of Kentucky awarded relief to Alliant 31 and

---

[14] Furthermore, it is unclear whether *Rooker-Feldman* even applies to a privy.  *See Lance v. Dennis*, 546 U.S. 459, 466 n.2, 126 S. Ct. 1198, 1202 n.2 (2006) (per curiam) ("[W]e need not address whether there are *any* circumstances, however limited, in which *Rooker–Feldman* may be applied against a party not named in an earlier state proceeding—*e.g.*, where an estate takes a *de facto* appeal in a district court of an earlier state decision involving the decedent.").  We do not reach this question because as we already explained, Alliant was not a privy to the divorce proceedings.  *See supra* pp. 22–23.

Alliant 31-A in an amount of $1,478,489.  Defendants argue that Alliant 31 (1) was permitted to prosecute a UFTA claim for its share of the $1,478,489 only and (2) because it failed to establish that share, it was entitled to collect none of it.  To assess this argument, we describe the property interests that Alliant 31 had in the Kentucky judgment that it could enforce in this UFTA action.

To determine the meaning of a judgment, we apply "[o]rdinary principles of construction."  *Gurley v. Lindsley*, 459 F.2d 268, 275 (5th Cir.), *mandate withdrawn*, 466 F.2d 498 (5th Cir. 1972) (per curiam).

The Kentucky judgment, on its face, states that "[j]udgment is hereby entered in favor of Plaintiffs, Alliant Tax Credit Fund 31-A, Ltd. . . . and Alliant Tax Credit 31, Inc."  *Alliant Tax Credit Fund 31-A, Ltd. v. Nicholasville Cmty. Hous., LLC*, No. 5:07-cv-00388-KKC-REW, slip op. at 1 (E.D. Ky. Aug. 31, 2010) (order amending judgment), ECF No. 204.  Through this judgment, Alliant 31 and Alliant 31-A became joint−judgment creditors because the legal right to enforce the judgment was entered in *each* of their favors.  As a joint creditor, Alliant 31 had a claim to the full $1,478,489 because a joint creditor "is entitled, along with another creditor, to demand payment from a debtor."  *Joint Creditor*, *Black's Law Dictionary* 375 (7th ed. 1999).  The District Court committed no error when it awarded Alliant this amount.  Though Alliant 31-A might have a claim to part of

the $1,478,489, and though it might have a contribution action against Alliant 31,

nothing prevented Alliant 31 from suing for the full amount.

We turn now to the burden of proof under the UFTA.

## IV.

Defendants argue that the District Court erroneously instructed the jury on

the burden of proof, stating that the correct burden under the UFTA is clear-and-

convincing evidence, not a preponderance of the evidence.[15]  We disagree that a

UFTA claim is subject to this heightened burden of proof.

First, preponderance of the evidence is the default standard in civil

proceedings.  O.C.G.A. § 24-14-3 (2018).  Tellingly, Georgia law expressly carves

out two civil actions that are subject to the clear-and-convincing standard, neither

of which are actions under the UFTA.  *Id.* (first citing *id.* § 51-1-29.5 (medical

malpractice claims arising out of emergency care); then citing *id.* § 51-12-5.1

(punitive-damages claims)).  Because Georgia's General Assembly subjected two

specific causes of action to the clear-and-convincing standard, we decline to infer

that claims under the UFTA are also exempted from the preponderance-of-

evidence default.  *Cf. Estate of Cummings v. Davenport*, 906 F.3d 934, 942 (11th

---

[15] Georgia's General Assembly amended the UFTA in 2015 and changed the statute's name to the UVTA.  In so doing, it specifically provided that preponderance is the burden of proof.  O.C.G.A. § 18-2-74(d) (2018); *see also id.* § 18-2-75(d).  The parties agree we must apply the UFTA, however, which lacks this enunciation.

Cir. 2018) ("The expression of one thing implies the exclusion of others."
(alteration omitted) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law:
The Interpretation of Legal Texts* § 10, at 107 (2012))), *petition for cert. filed*, No.
18-1191 (U.S. Mar. 13, 2019).

Second, the UVTA merely clarifies what had always been the law under the
UFTA. *Cf. Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1283 (11th Cir.
1999) ("[A]n amendment containing new language may be intended 'to clarify
existing law . . . .'" (quoting *United States v. Sepulveda*, 115 F.3d 882, 885 n.5
(11th Cir. 1997))). The official commentary to the Uniform Law Commission's
Voidable Transactions Act, which Georgia's UVTA was modeled on, explains that
the UVTA "rejects [states] that have imposed an extraordinary [evidentiary]
standard, typically 'clear and convincing evidence.'"[16] Unif. Voidable
Transactions Act § 4 cmt. n.10 (Unif. Law Comm'n 2014). Defendants give us no
reason to believe that Georgia was one such state. Indeed, they point to no
decision applying Georgia law that has *ever* imposed a higher burden of proof in a
fraudulent-transfer action.

In short, the District Court correctly instructed the jury on the burden of
proof. With that issue decided, we turn to the punitive-damages awards.

---

[16] Georgia courts look to this commentary when interpreting Georgia's fraudulent-
transfer law. *Bishop v. Patton*, 706 S.E.2d 634, 640 (Ga. 2011).

V.

Defendants argue that the punitive-damages awards were improper because punitive damages may be awarded only in addition to compensatory damages, which were not awarded here.  Marilyn argues alternatively that even if punitive damages were proper, the District Court erred by forcing her to pay the award against Vincent from her kitty.

A.

In addition to recovering the value of its claim, a fraudulent-transfer creditor can also recover compensatory damages—that is, damages that result from the fraudulent transfer itself.  Defendants submit that Alliant could not recover punitive damages because it was awarded no compensatory damages.  Neither the punitive-damages statute, the caselaw, nor the policy that underpins punitive damages supports their argument.

Alliant invoked the District Court's diversity jurisdiction, which requires us to apply Georgia substantive law.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938).  In determining the contents of Georgia law, decisions of the Supreme Court of Georgia and the Georgia Court of Appeals control.  *See Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009) (per curiam) ("[F]ederal courts are bound by decisions of a state's intermediate appellate courts unless there is persuasive evidence that the highest state court would rule

28

otherwise." (quoting *King v. Order of United Commercial Travelers of Am.*, 333 U.S. 153, 158, 68 S. Ct. 488, 491 (1948))).

The punitive-damages statute articulates two restrictions on punitive damages, neither of which is violated by the awards here.  A court may award punitive damages "only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed . . . fraud."  O.C.G.A. § 51-12-5.1(b) (2018).  As relevant here, moreover, an award of punitive damages may not exceed $250,000 unless the defendant "acted, or failed to act, with the specific intent to cause harm."  *Id.* §§ 51-12-5.1(f), (g).  Check and check: The jury found fraud by clear-and-convincing evidence.  And it found that Vincent had acted with specific intent to cause harm.  Because the jury did not find that Marilyn had acted with specific intent to cause harm, the punitive damages against her were properly capped at the statutory maximum of $250,000.

The Georgia Court of Appeals has repeatedly stated, moreover, that punitive damages are available in fraudulent-transfer actions without once stating that compensatory damages are a prerequisite to recovering them.  *See Interfinancial Midtown, Inc. v. Choate Constr. Co.*, 806 S.E.2d 255, 264 (Ga. Ct. App. 2017) ("Georgia law allowing the recovery of general and punitive damages for fraudulent conveyances survived the enactment of Georgia's UFTA."); *Stinchcomb v. Wright*, 628 S.E.2d 211, 215 (Ga. Ct. App. 2006) ("Punitive damages may be

awarded upon a finding of conversion or fraudulent conveyance."); *Cavin v. Brown*, 538 S.E.2d 802, 806 (Ga. Ct. App. 2000) ("[P]unitive damages are available in fraudulent conveyance actions . . . .").

*Stinchcomb* in particular negates Defendants' theory that compensatory damages are a prerequisite for punitive damages. The defendant there argued that an award of attorneys' fees and punitive damages was improper because the jury had awarded only specific performance, not compensatory damages. 628 S.E.2d at 215. The court rejected that argument, holding, "Since the [plaintiffs] proved their claims of fraudulent conveyance and were awarded specific performance, the trial court's award of attorney fees and punitive damages was proper." *Id.* at 215–16. Vincent and Marilyn state that the award of specific performance distinguishes that case from this case. As an initial matter, that assertion is factually incorrect because the District Court ordered Marilyn to turn over the fraudulently transferred assets or their proceeds. But even if the Court had invoked the legal remedy under the UFTA, as it should have, *Stinchcomb* would still control. Whether a court orders turnover of the assets or enters a money judgment for their value hinges only on whether the assets or their proceeds are traceable. If they are, turnover is appropriate; if they aren't, a money judgment should be entered. Either way, the need to deter the transfer is the same. We explain this idea more below.

One policy of punitive damages is deterrence.  1 Dan B. Dobbs, *Dobbs Law of Remedies* § 3.11(3), at 475−76 (2d ed. 1993).  Without punitive damages, nothing other than costs would deter a debtor from attempting to fraudulently transfer his assets.  If he gets caught, so be it: The cost would simply be what was owed in the first place.  *See, e.g.*, *SE Prop. Holdings, LLC v. Judkins*, No. 1:17-CV-00413-TM-B, 2019 WL 177981, at *10 (S.D. Ala. Jan. 11, 2019) ("Without an award of punitive damages or attorneys' fees, there would be no deterrence to a debtor weighing whether to make a fraudulent transfer.  This is because the debtor would only lose the same asset he would have lost if he had not made a fraudulent transfer."); *Kekona v. Bornemann*, 349 P.3d 361, 372 (Haw. 2015) ("[A]t worst the fraudulent debtor is forced to pay what he or she already owed.  Without the possibility of significant punitive damages, it would be difficult to deter this conduct.").  It thus makes sense that the UFTA would permit recovery for punitive damages.  *See* Dobbs, *supra*, § 3.11(10), at 516 ("[T]he need for punishment or deterrence may be increased by reason of the very fact that the defendant will have no liability for compensatory damages.").

In short, the absence of compensatory damages did not preclude the award of punitive damages.

B.

31

Marilyn's alternative argument—that she should not be responsible for paying Vincent's punitive-damages award—is meritorious.

Under the UFTA, a creditor may obtain "judgment [against the transferee] for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less." O.C.G.A. § 18-2-78(b) (2010). After the jury returned its verdict, the District Court should have entered two judgments—one against Marilyn (the transferee) and one against Vincent (the transferor):

- A money judgment against Marilyn for $9,137,285.84 (the amount of the claim, plus her $100,000 in punitive damages).

- A money judgment against Vincent for $1,000,000 (the amount of his punitive damages).

The Court erred when it required Marilyn to pay Vincent's money judgment— awarded for *his* wrongdoings, mind you—out of her pocket. But Alliant complicates what seems to be a straightforward result.

Alliant asserts that its "claim" within the meaning of § 18-2-78(b) includes the $100,000 in punitive damages awarded against *Vincent*. Said differently, the District Court should have entered a single money judgment against Marilyn, the entirety of which she would be personally responsible for. We are unsurprised that Alliant brings us not one case from any jurisdiction where a court has interpreted a fraudulent-transfer "claim" to include damages awarded for the transfer itself. We undertake our own analysis, however, and for two reasons, we cannot agree with

Alliant's assertion.  First, a fraudulent-transfer action is derivative of some other right to relief.  Alliant's approach would collapse into one the action and the claim that gave rise to that action.  And second, the UVTA, which Georgia's General Assembly replaced the UFTA with in 2015, confirms that "claim" excludes relief awarded for the fraudulent transfer itself.  We discuss both reasons in turn.

First, a fraudulent-transfer action is predicated on a claim that already exists. *See* Dobbs, *supra*, § 2.8(1), at 191−92.  Alliant incurred a claim to the amount of the Kentucky judgment.  Alliant then brought this UFTA action to recover the value of that claim.  In the process, Alliant incurred a new, *second* claim against Vincent when the Georgia jury awarded Alliant punitive damages for Vincent's fraud.  This second claim is extrinsic to the claim on which the UFTA action was predicated.

Second, the UVTA confirms that "claim" under the UFTA cannot encompass relief for the fraudulent transfer itself.  *Cf. Piamba Cortes*, 177 F.3d at 1283 ("[A]n amendment containing new language may be intended 'to clarify existing law.'" (quoting *Sepulveda*, 115 F.3d at 885 n.5)).  In replacing the UFTA with the UVTA, Georgia's General Assembly amended the definition of claim to include the following italicized language: "'Claim,' *except for claim for relief*, means a right to payment . . . ."  O.C.G.A. § 18-2-71(3) (2018) (emphasis added).  The UVTA thus distinguishes "claim" and "claim for relief."  Whereas the "claim

for relief" is the UFTA action itself, "claim" is the predicate on which that action is based.  As described below, this change merely clarified what had already been the law under the UFTA.

Georgia's General Assembly inserted into the UVTA two new subsections on burden-of-proof and choice-of-law rules that govern a fraudulent-transfer action.  These subsections are the only places where "claim for relief" appears in the UVTA.  They provide that

- a UVTA plaintiff "has the burden of proving the elements of the *claim for relief* by a preponderance of the evidence" and that

- "[a] cause of action in the nature of a *claim for relief* under [the UVTA] is governed by the law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred."

*Id.* §§ 18-2-74(d), -80(b) (emphasis added).  But inserting these two subsections would risk confusion under Alliant's reading of "claim": Do the burden-of-proof and choice-of-law rules apply to the UFTA action, the predicate claim, or both?  Recognizing this risk, the General Assembly amended the definition of "claim" to make explicit what had long been implicit: The "claim for relief" and the "claim" are two separate things.  *Cf.* Scalia & Garner, *supra*, § 40, at 257 (stating that the "presumption that a change in language produces a change in meaning" does not apply when codifications "revise the wording of the prior statute to provide for consistency of expression").

In short, because Alliant's claim did not include the punitive damages awarded against Vincent, the Georgia judgment is reversed to the extent it allowed Alliant to recover those damages from Marilyn. We now turn to Alliant's cross-appeal.

## VI.

Alliant cross-appeals the District Court's denial of prejudgment interest under Georgia law from the date the Kentucky judgment was entered to the date the Georgia judgment was entered.

Recall that the District Court awarded Alliant post-judgment interest. Under federal law, the Kentucky judgment accrued interest from the moment that judgment was entered until it was paid. *See* 28 U.S.C. § 1961. By the time the Georgia judgment incorporated the Kentucky judgment, the post-judgment interest on the latter had accrued to $90,642.89. No one disputes that Alliant is entitled to that amount. But Alliant wants prejudgment interest, too. The parties agree that Alliant's entitlement to prejudgment interest hinges on Alliant's UFTA claim being "liquidated" under Georgia law. We explain below that the claim was not liquidated as to Marilyn—from whom recovery must be had—so the Court was correct to deny Alliant prejudgment interest.

Absent "affirmative countervailing federal interests," the availability and amount of prejudgment interest is governed by state law. *AIG Baker Sterling*

*Heights, LLC v. Am. Multi-Cinema, Inc.*, 508 F.3d 995, 1001–02 (11th Cir. 2007)

(quoting *Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1307 (11th Cir. 2002)).

Under Georgia law, "[a]ll liquidated demands, where by agreement or otherwise

the sum to be paid is fixed or certain, bear interest from the time the party shall

become liable and bound to pay them; if payable on demand, they shall bear

interest from the time of the demand." O.C.G.A. § 7-4-15 (2018). "[T]he sole

prerequisite for an award of prejudgment interest on a liquidated claim is that a

demand be made before the entry of final judgment, so that the opposing party has

an opportunity to contest an award of interest." *Gwinnett County v. Old Peachtree*

*Partners, LLC*, 764 S.E.2d 193, 200 (Ga. Ct. App. 2014).

The only point in dispute is whether Alliant's claim to the amount of the

Kentucky judgment was liquidated.

A sum is liquidated when it is "fixed or certain based on . . . operation of

law." *Those Certain Underwriters at Lloyds London v. DTI Logistics, Inc.*, 686

S.E.2d 333, 339 (Ga. Ct. App. 2009). The full amount of the Kentucky judgment,

$8,946,643, was fixed by law *as to Vincent* on the date the District Court for the

Eastern District of Kentucky entered judgment for that amount against him. But

Marilyn is a different story. The conduct for which Marilyn is liable is receipt of

the transferred assets when she (1) did not act in good faith and (2) did not give

reasonably equivalent value for them. *See* O.C.G.A. § 18-2-78(a) (2010). Because

the jury was required to determine the values of each of those assets, the amount for which she is personally liable did not become liquidated until the District Court entered the Georgia judgment.

In short, Alliant is not entitled to any prejudgment interest under Georgia law because its claim for $8,946,643 was not previously liquidated as to Marilyn.

VII.

For these reasons, the District Court's judgment is **AFFIRMED** in part and **REVERSED** in part.  We **REMAND** for further proceedings not inconsistent with this opinion.

**SO ORDERED.**

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

May 15, 2019

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 15-14634-GG
Case Style: Alliant Tax Credit 31, Inc, et al v. M. Vincent Murphy, III, et al
District Court Docket No: 1:11-cv-00832-RWS

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, each party to bear own costs.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Joe Caruso, GG at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs